IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FLEMING STEEL COMPANY,          )
                                )
            Plaintiff,          )
                                )
        vs.                     )  Civil Action No. 02-828
                                )
W.M. SCHLOSSER COMPANY, INC.,   )
                                )
            Defendant.          )

MEMORANDUM

I

In this diversity action, plaintiff, Fleming Steel Company, seeks damages from defendant, W.M. Schlosser Company, Inc., for breach of contract.  In response, defendant has filed a counterclaim against plaintiff for breach of contract.  Before the Court are the cross-motions of the parties for summary judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth below, the motions will be denied .

II

For purposes of the present motions, the following facts are undisputed:

An aircraft acoustical enclosure, also known as a "hush house," is a structure that is built to be as soundproof as possible.  The United States Navy ("the Navy") utilizes aircraft acoustical enclosures for engine-in-aircraft high power testing to minimize the disturbance that such testing causes to neighbors.  (Pl's CSMF, ¶¶ 15-16, Exh. 5 to Df's Response to Pl's CSMF, p. 4).

On December 29, 1999, the Navy issued a solicitation in connection with the construction of a 12,000 square foot prefabricated steel and concrete aircraft acoustical enclosure at the Oceana Naval Air Station in Virginia Beach, Virginia ("the Oceana project").  Defendant, which is in the business of performing general contracting work, submitted a bid in response to the solicitation, and, on February 17, 2000, the Navy awarded the prime contract for the Oceana project to defendant.[1]  The scheduled completion date for the Oceana project was October 17, 2001.  (Pl's CSMF, ¶¶ 7-8, 10, Pl's App., p. 135, Exh. 2 to Df's Amended Statement of Material Facts not in Dispute, ¶¶ 6-9).

Plaintiff is in the business of fabricating custom doors for facilities, such as steel mills, manufacturing plants and aircraft hangars.[2]  (Pl's CSMF, ¶ 2).  On June 12, 2000, defendant entered into a subcontract with plaintiff pursuant to which plaintiff was responsible for fabricating the acoustical intake sliding doors for the Oceana project.  Under the subcontract, plaintiff was to be paid $1,655,357 for the

_____

[1]Defendant is a Maryland corporation with a principal place of business in Hyattsville, Maryland.  Since 1987, Andrew Schlosser has been defendant's President.  (Amended Complaint, ¶ 4, Answer, ¶ 4, Exh. 34 to Df's Response to Pl's CSMF, ¶ 1, Exh. 2 to Df's Amended Statement of Material Facts not in Dispute, ¶ 8).

[2]Plaintiff is a Pennsylvania corporation with a principal place of business in New Castle, Pennsylvania.  Seth Kohn is plaintiff's President.  (Pl's CSMF, ¶¶ 1, 4, Exh. 3 to Df's Amended Statement of Material Facts not in Dispute, ¶ 4).

fabrication.[3]  (Pl's CSMF, ¶¶ 17, 20).  With respect to breaches,
Article 8 of the parties' subcontract provided:

*    *    *

   8.   The following shall be deemed a breach of this
        agreement: Failure to fulfill any obligation of this
        Subcontract or of the Prime Contract concerning
        Subcontractor's work or responsibilities; Failure to
        pay for labor or materials, payroll taxes,
        contributions or insurance premiums; Interference with
        the performance of the work by others for any reason;
        Failure to maintain Contractor's progress schedule in
        effect at that time; Any act of insolvency or
        bankruptcy; Failure to provide adequate manpower on
        site; Failure to maintain valid and enforceable
        payment, performance and maintenance bonds throughout
        the duration of the project.  If Subcontractor breaches
        this Subcontract, Contractor may terminate
        Subcontractor's right to proceed upon three (3)
        calendar days' written cure notice.  Contractor may
        then have all or a portion of Subcontractor's work
        completed and may use Subcontractor's materials,
        supplies, tools and equipment to complete.  In this
        regard, Subcontractor acknowledges that it is
        reasonable to employ a reputable substitute contractor
        on a cost-plus or time and material basis to complete
        all or part of Subcontractor's work.  Subcontractor
        (and its surety) shall continue to be liable for all
        costs to complete and any damage and expenses including
        reasonable counsel fees, liquidated damages assessed by
        Owner and other liabilities which may result from the
        default and breach, without waiver of any other rights
        or remedies available to Contractor, including the
        right to set off any collections or any funds which may
        be due to Subcontractor under other subcontracts with
        Contractor.  All notices will be sent to the address

---

[3]Article 15 of the parties' subcontract incorporated the
prime contract between defendant and the Navy by reference.
(Pl's App., p. 136).  Moreover, the Solicitation, Offer and Award
for the prime contract incorporated clauses of the Federal
Acquisition Regulations (some clauses were incorporated by
reference, while other clauses were incorporated by full text).
(Exh. 9 to Df's Amended Statement of Material Facts not in
Dispute, ¶ 6).

indicated above unless otherwise advised by the
Subcontractor.  **If it is determined that Contractor
wrongfully terminated this Subcontract under this
Article, that action shall be treated as a termination
for the Contractor's convenience and Subcontractor
shall be entitled to the compensation set forth in
Article 29 of this Agreement.**[4]  (Emphasis added).

\*   \*   \*

(Pl's App., p. 136).

The acoustical intake sliding doors to be fabricated by

plaintiff for the Oceana project were divided into modules and

each module consisted of several components, including acoustical

_____

[4]Article 29 of the parties' subcontract provided:

\*   \*   \*

29.  Contractor shall have the right to terminate this
     agreement for its own convenience for any reason by
     giving notice of termination.  Notice of termination is
     effective upon receipt by Subcontractor.  If the
     Termination for Convenience is initiated by the Owner,
     settlement shall be accomplished in accordance with the
     Termination for Convenience clause in the Prime
     Contract.  If there is no Termination for Convenience
     clause in the prime contract, or **if the termination is
     initiated by the Contractor, the Subcontractor shall be
     paid only the actual cost for work and labor in place,
     plus five percent (5%) overhead and profit, or a
     prorated percentage of the Subcontract equal to the
     percentage of completion, whichever is less.**  In no
     event shall subcontractor be entitled to recover
     unabsorbed overhead or anticipatory profits on
     unperformed portions of the work.  Contractor shall
     have the right to audit and review Subcontractor's
     books and records at any time.  (Emphasis added).

\*   \*   \*

(Pl's App., p. 138).

4

splitter baffles.[5]  To construct a splitter baffle, a perforated
stainless steel sheet is welded onto one side of a stainless
steel channel frame.  Insulation, which has been wrapped in
fiberglass cloth,[6] is then inserted into the frame and another
perforated stainless steel sheet is welded onto the other side of
the frame.[7]  The parties' subcontract required plaintiff to

--------

[5]Other components of the modules for the acoustical intake
sliding doors included acoustical panels and acoustical turning
vanes.  The construction of these components was similar to the
construction of the splitter baffles.  (Pl's CSMF, ¶ 25).

[6]The type of fiberglass cloth to be used in the splitter
baffles was specified in the parties' subcontract.  Specifically,
Section 2.1.5.d of Section 13300 of the subcontract provided:

                        *    *    *

    d.   Glass Fiber Cloth: Provide fiberglass cloth with the
         following properties: count - 34x22; warp - 75/1/0;
         filling - 75/1/0; weight - 5.45 ounces per square yard;
         thickness - 0.0065-inches; tensile strength - 225x195
         pounds per inch, greige, and shall be style No. 7626
         plain weave fiberglass.  Manufacturers presently
         weaving this style fiberglass cloth include: B.G.F.
         Industries Inc., 301 N. Elm Street, PO Box 21207,
         Greensboro, North Carolina 27401 and Clark - Schwebel
         Inc., 2200 S. Murray Avenue, PO Box 2627, Anderson,
         South Carolina 29622.  Notwithstanding any other
         requirements of this contract, no other product will be
         accepted.

                        *    *    *

(Pl's CSMF, ¶ 42, Pl's App., p. 154).

[7]The splitter baffles for the Oceana project were 11'6" x
8'6" x 4.5", and each splitter baffle weighed approximately 550
pounds.  (Exh. 3 to Df's Amended Statement of Material Facts not
in Dispute, ¶ 22).

fabricate 18 splitter baffles for the acoustical intake sliding
doors for the Oceana project.[8]  (Pl's CSMF, ¶¶ 20-24).

Specifications for the acoustical intake sliding doors were
set forth in Section 13300 of the parties' subcontract and
included the following:

SECTION 13300

ACOUSTICAL INTAKE SLIDING DOORS

*   *   *

1.4.2.1  Specimen Acoustical Panel and Baffle

Prior to fabrication of acoustical panels and baffles to be
used in the acoustical intake sliding doors, the
manufacturer shall fabricate a full size specimen of a
typical acoustical panel and baffle which shall be approved
by the Contracting Officer and which shall serve as the
reference for establishing the acceptability of all
fabricated acoustical panels and baffles.  The specimen
acoustical panel and baffle shall conform to all of the
requirements of the contract including quality control,
testing, form, fit, size and function and shall meet all of
the requirements of the contract documents.  Fabrication and
all contract document requirements must be satisfied and
complete prior to submission of specimens for approval.  All
acoustical panels and baffles shall be continuously
inspected during fabrication to assure that the packed
insulation exerts a uniform outward pressure on the face
sheets and that there are no visible voids or wrinkles in
the fiberglass cloth facing.

*   *   *

3.3.2.1  Acoustical Panels, Splitter Baffles and Acoustical
Turning Vanes

Fabricate as indicated and as specified herein:

---

[8]According to defendant, the splitter baffles are installed
in the acoustical intake sliding doors to assure proper air flow
to the jet engines being tested.  (Df's Brief in Opp., p. 2).

6

a.  Acoustical material for installation in wall panels, splitter baffles and turning vanes shall fill the void space to the full density indicated.  Acoustical material within the perforated sheet facing shall be so fabricated as to be compressed and exert pressure on the sheets and packing to prevent flutter due to air pressure and velocity.  The sheets, or combination of sheets, shall be formed and fastened to provide a rigid integral panel.  The cloth fabric shall be placed around the acoustical insulation with extreme care to prevent tears or wrinkles.  A specimen acoustical panel and splitter baffle shall be fabricated and approved by the Contracting Contracting (sic) Officer prior to fabrication of the panels and splitter baffles to be used in the door.  The approved panel and splitter baffle shall serve as the reference for establishing the acceptability of all fabricated panels.  All acoustical panels, splitter baffles, and acoustical turning vanes shall be continuously inspected during fabrication to assure that the packed insulation exerts a uniform outward pressure on the face sheets and that there are no visible voids or wrinkles in the fiberglass cloth facing.

*   *   *

(Pl's App., pp. 151-52, 172).[9]

_____

[9]Section 1.4.1.3 of Section 13300 of the parties' subcontract, relating to Welding Inspection and Testing, provided in part: "Nondestructive tests for structural steel fabrication shall be performed by an independent testing laboratory approved by the Contracting Officer, engaged by the Contractor at the expense of the Contractor."  Pursuant to this provision, plaintiff hired the Non-Destructive Testing Group to conduct testing on the welds of the components of the acoustical intake sliding doors for the Oceana project.  (Pl's CSMF, ¶ 32).

Plaintiff fabricated a specimen splitter baffle,[10] and, on May 31, 2001, Reginald E. Turknett, a consultant for the Navy's Engineering Service Center and a representative of the Navy's Contracting Officer, conducted a site visit to plaintiff's New Castle facility for the purpose of approving the specimen splitter baffle pursuant to paragraph 1.4.2.1 of Section 13300 of the subcontract between the parties.  Mr. Turknett reviewed the specimen splitter baffle, and, although he noted various discrepancies which required correction, Mr. Turknett found the specimen splitter baffle to be acceptable.  (Pl's App., pp. 195-96).  By letter dated June 4, 2001, Wirt Shinault, P.E., the Navy's Resident Engineer in Charge of Construction, notified defendant that the specimen splitter baffle fabricated by plaintiff had been inspected on May 31, 2001 and was found to be acceptable.  (Pl's CSMF, ¶ 13, Pl's App., p. 194).

On June 13, 2001, Mr. Turknett conducted another site visit to plaintiff's New Castle facility for the purpose of (a) approving the specimen acoustical panel fabricated by plaintiff and (b) reviewing the specimen splitter baffle again following

---

[10]Plaintiff originally subcontracted the fabrication of the splitter baffles to a company called Techniweld.  However, Techniweld defaulted on its subcontract with plaintiff by performing substandard quality work.  As a result, plaintiff took over fabrication of the splitter baffles.  (Pl's CSMF, ¶¶ 26-27).

installation of the leading and trailing edges.[11]  In his report concerning this site visit, Mr. Turknett noted that the specimen acoustical panel was reviewed and found to be acceptable, although he noted several discrepancies which needed correction. As to the specimen splitter baffle, Mr. Turknett noted one discrepancy which required correction.  (Pl's App., pp. 198-99). By letter dated June 15, 2001, Mr. Shinault notified defendant that the specimen acoustical panel fabricated by plaintiff had been inspected on June 13, 2001 and was found to be acceptable. Mr. Shinault's June 15th letter does not mention the specimen splitter baffle which had been re-inspected.  (Pl's App., p. 197).

On August 30, 2001, Mr. Shinault sent a letter to defendant regarding an August 28th inspection conducted by a representative of the Navy's Contracting Officer at plaintiff's New Castle facility.  The letter stated in part:

* * *

During a review of the Acoustical Intake Sliding Doors offsite work for Contract Specification compliance and status of Door Manufacturing process, made on August 28, 2001 by the Contracting Officer's Representative in accordance with Contract Specification 01450 par. 1.10.3 Follow-Up Inspections (sic).  It is felt that the Quality Control is not providing the same Quality that went into manufacturing the samples that were inspected on May 31,

---

[11]At the time of Mr. Turknett's initial site visit to plaintiff's New Castle facility on May 31, 2001 to inspect the specimen splitter baffle, the leading and trailing edges had not been installed.

9

2001, and June 13, 2001.  The following items were looked at
in Fleming Steels (sic) shop on August 28, 2001 and need
your immediate concern:

                         *    *    *

2.      Splitter Baffle Piece No. 6-A-1: a) Insulation Fabric
        burned through needs to be replaced, b) Check all
        fabricated pieces for burn through and replace, c)
        Numerous spots of buckling were measured in the
        perforated sheet some at 7/8" [-] correct as necessary
        to meet specifications, d) Clean welds in corners of
        panels, e) edge clearance on fit up incorrect, and
        crown in panel measured at 3/8" [-] these items need to
        be corrected, f) Leading edges do not fit up with panel
        correctly, g) check tolerances with specifications on
        all of above items.

                         *    *    *

As of this date the schedule provided from your W.M.
Schlosser states the Acoustical Doors will be delivered and
erected in time to meet the Contract Completion date.  I do
understand that you have been told by your Fleming Steel
that this is not going to happen based on his inability to
meet milestone dates he set for himself, and despite his
promises to this office to deliver the product on schedule.

Provide a Schedule outlining the impact to the overall
project by September 7, 2001.  You are reminded that the
Contract Completion date is October 17, 2001 and liquidated
damages are $4,583.00.[12]  As always we strive to provide you
the necessary information and cooperation to keep the
project Quality per Contract Requirements, and the Project
on Schedule.

                         Sincerely,
                         s/Wirt Shinault, P.E.
                         Resident Engineer in Charge of
                         Construction

(Pl's App., pp. 200-01).

---

[12]Liquidated damages under the prime contract between
defendant and the Navy were $4,583.00 for each day of delay.
(Exh. 5 to Df's Response to Pl's CSMF, p. 11).

The concerns raised in Mr. Shinault's August 30th letter were communicated to plaintiff, and, by letter to defendant dated September 6, 2001, plaintiff's President, Seth Kohn, responded to those concerns.[13]  With regard to the Navy's complaints about splitter baffle No. 6-A-1, Mr. Kohn stated:

                         *    *    *

2.   SPLITTER BAFFLE PIECE NO. 6A-1

     A.   The trim piece and perforated sheet will be
          removed, the fabric cloth will be replaced with
          new cloth and the perforated sheet and trim piece
          will be re-installed and weld tested.  To further
          protect the fabric from being burned, we will
          continue to place a stainless steel plate over the
          perforated sheet to protect the fabric.

     B.   The balance of baffles will be inspected for this
          condition.

     C.   To meet the specification requirements, we will
          loosen and re-attach the perforated sheets to
          correct the buckling condition.  This work will be
          done in accordance with the proper procedures.

     D.   Cleaning was not complete at the time the baffle
          was viewed.  The corners will be cleaned at the
          proper time.

———————————————

[13]In his letter, Mr. Kohn initially took exception to the following statement in Mr. Shinault's August 30th letter: "It is felt that the Quality Control is not providing the same Quality that went into manufacturing the samples that were inspected on May 31, 2001, and June 13, 2001." According to Mr. Kohn, the August 28th inspection was not a scheduled formal inspection. Rather, it was an interim visit to determine the progress of the work being performed by plaintiff, and Mr. Kohn maintained that, as a result, none of the materials that were examined and mentioned in Mr. Shinault's letter were complete and ready for an official inspection. (Pl's App., p. 202).

      E.    During operations stated in A & C, this clearance problem will be corrected.

      F.    The leading edge will be removed, trimmed to the low end of +/- 1/8" to match the baffle dimensions.

      G.    Quality Control will conduct inspections at the appropriate times.

*   *   *

(Pl's App., pp. 202-07).

On October 31, 2001, Tom Rapp, plaintiff's Vice President of Operations, wrote the following letter to William Jones, defendant's Quality Control Manager:

Dear William:

As you know, the fabric cloth within some of the fabricated splitter baffles is burnt through in places.  Fleming has made inquiries as to what might be available to patch these burn through holes rather than remove and replace the entire fabric.  The fabric manufacturer directed us to Adhesive Research, Inc. who manufactures adhesive tapes used to splice the fabric cloth in question.

Enclosed is a product data sheet and sample of the material Arclad 7353.

Also enclosed are three samples of other patching materials. Unfortunately, product data sheets are not available for these products.

Please notify us as soon as you can as to whether any of these products would be acceptable.

Should you have any questions or require additional information, please do not hesitate to contact us.

                Yours very truly,
                FLEMING STEEL COMPANY
                s/Tom Rapp
                Vice President, Operations

(Pl's App., p. 210).[14]

On November 5, 2001, Mr. Jones responded to Mr. Rapp's October 31st letter with the following facsimile:

> Tom,
>
> Request for authorization to utilize patching material for the burned holes in the splitter baffles is denied.  Please continue with initial direction to replace the fabric cloth for the affected areas.
>
> Thank you,
> William Jones, CQC Manager

(Pl's App., p. 212).

Thereafter, plaintiff re-fabricated nine of the 18 splitter baffles.  (Pl's CSMF, ¶ 92).

On February 15, 2002, representatives of the Navy and representatives of defendant visited plaintiff's New Castle facility for the purpose of inspecting the nine splitter baffles which had been re-fabricated to repair the burn holes in the fiberglass cloth surrounding the insulation.  Subsequently, Mr. Jones, one of defendant's representatives during the February

---

[14]With respect to the significant lapse of time between Mr. Kohn's September 6th letter to defendant, and Mr. Rapp's October 31st letter to defendant, Mr. Rapp testified that he had been out of the office for 6 to 8 weeks due to illness.  (Pl's App., pp. 46-47).  When he returned to work, Mr. Rapp informed Mr. Kohn that removing the stainless steel sheets on the splitter baffles, replacing the burned fiberglass cloth surrounding the insulation and re-welding the stainless steel sheets to the frames would cause severe distortions to the splitter baffles.  (Pl's CSMF, ¶ 83).  As a result, plaintiff explored other means to remedy the burns in the fiberglass cloth surrounding the insulation.  (Pl's CSMF, ¶ 84).

15th visit, prepared a report in which he described in detail his
inspection of each of the nine re-fabricated splitter baffles.
Mr. Jones then rendered the following conclusion:

> \*    \*    \*
>
> ### *Conclusion*
>
> In general, all 9 of the inspected Splitter baffles that
> have been reworked to (sic) due burned fabric underneath the
> perforated stainless steel sheeting, display various amounts
> of bulges and deflections in the horizontal flatness areas,
> display irregular or "out of shape" radius pieces for the
> leading and trailing edges, are dimensionally smaller than
> specified, and the leading and trailing edges, for the most
> part, are no longer lapped onto the margins of the
> perforated sheeting which has exposed the "C" channel
> underneath it.
>
> Furthermore, I have concluded that these 9 Splitter Baffles
> are not within the tolerances specified by the contract
> drawings, contract specifications, or approved Splitter
> Baffle sample and shall not be utilized for installation.
>
> \*    \*    \*

(Pl's App., pp. 212-26).

On February 15, 2002, the date of the inspection of the nine
re-fabricated splitter baffles at plaintiff's New Castle
facility, Mr. Shinault, the Navy's Resident Engineer in Charge of
Construction, sent a letter to Mr. Karabin, defendant's Project
Manager, indicating that the following items which were observed
during the February 15th inspection needed immediate attention:

> \*    \*    \*
>
> 1.   Welds were improperly spaced on turning vane no. 2.
> 2.   Plug welds were (sic) on leading edge of turning vane
>      no. 5 were improper.

14

3.  Acoustical Panels in rain cap are not properly stuffed;
    insulation is not against outside of Panel.
4.  Improper fit up of edges on splitter baffles.
5.  Deformed perforated sheets out of tolerance on splitter
    baffles.
6.  Need certifications for all welders.
7.  You are reminded of the information required per
    contract specification section 13300 par. 1.3.4.6, Shop
    Inspection and Test Results, prior to factory
    demonstration.

*   *   *

Mr. Shinault concluded his letter to Mr. Karabin as follows: "In
respect to the above listed items provide information on how
these items will be corrected, by February 22, 2002." (Exh. 8 to
Df's Response to Pl's CSMF).

On February 20 and February 21, 2002, Mr. Jones, defendant's
Quality Control Manager, returned to plaintiff's New Castle
facility to inspect the other nine splitter baffles that had been
fabricated by plaintiff, including the specimen splitter baffle.
Mr. Jones began his report concerning this inspection as follows:

The purpose of this visit to Fleming Steel's shop was to
conduct a detailed inspection of the Splitter Baffles that
reflect, "burned" or "charred" areas of fiberglass cloth
underneath the stainless steel perforated sheet, to
determine whether or not the areas of concern actually
contain holes in the fiberglass cloth.

*   *   *

Mr. Jones then described his findings as to each of the nine
splitter baffles, and set forth his conclusion as follows:[15]

---

[15]According to his report, Mr. Jones' inspection on February
20 and February 21, 2002 of the 9 splitter baffles that had not
been re-fabricated by plaintiff revealed the following number of

*Conclusion:*

Dimensionally, (including horizontal flatness), the 9 inspected Splitter Baffles are as good and in some cases better, than the dimensions reflected in the approved sample panel, piece 6a-13.

However, due to the defective material within the Splitter Baffles, the above-mentioned 9 baffles are unacceptable and shall not be utilized for installation.

**This concludes that all 18 fabricated Splitter Baffles have not been fabricated within the tolerances and guidelines set forth in the Contract Drawings and/or Contract Specifications and are unacceptable.**

(Pl's App., pp. 217-20).

On February 21, 2002, Mr. Rapp, plaintiff's Vice President of Operations, sent the following facsimile to Mr. Karabin, defendant's Project Manager, concerning the Navy's prior approval of the specimen splitter baffle and the subsequent rejection of all 18 splitter baffles fabricated by plaintiff:

Dear Rich,

Attached are copies of two (2) faxes relative to the referenced specimen approval.

---

burn holes:

```
Splitter Baffle 1.6a-13 (sample) -      10
Splitter Baffle 2.6a-18           -      13
Splitter Baffle 3.6a-12           -       1
Splitter Baffle 4.6a-4            -       7
Splitter Baffle 5.6a-11           -      32
Splitter Baffle 6.6a-5            -       2
Splitter Baffle 7.6a-9            -       5
Splitter Baffle 8.6a-10           -       6
Splitter Baffle 9.6a-1            -      13
```

(Pl's App., pp. 217-18).

16

The first report indicates that the baffle is approved.  At the time of the first approval inspection, the leading and trailing edge trim was not attached.

The second report deals mainly with the approval of the Specimen Acoustical Panel, however, page 2 reports that the Specimen Acoustical Baffle was reviewed with the leading and trailing edge trim attached and approved with only one discrepancy noted.  Nothing was said or reported concerning burns in the fiberglass cloth.  No work has been done on the Specimen Acoustical Baffle since the date of its approval (June 15, 2001).  How does it happen that a specimen can be approved by both Reggie and Wirt in June of 2001, and the same piece be rejected in February of 2002?

The nine baffles re-inspected yesterday are all within the same tolerance of the approved specimen.  The cloth is in the same relative condition on all nine of these baffles as well.  The first nine baffles that were repaired and are now out of specified tolerance were within tolerance prior to replacing the cloth and re-welding.  The cloth that was replaced was in the same condition as that of the approved specimen baffle.

Sincerely,
s/Tom Rapp

(Pl's App., p. 221).[16]

_____

[16]Mr. Karabin responded to Mr. Rapp's facsimile on the same day, February 21, 2002.  While noting that the Navy's letters regarding the two inspections of the specimen splitter baffle which were conducted in May and June of 2001 indicate that the specimen was acceptable, Mr. Karabin stated that this fact "does not mean that the sample takes the place of the contract documents or was given final approval."  Mr. Karabin also stated: "If future inspections reveal deficiencies with the fabrication, the previous inspections do not relieve the contractor from the responsibility of correcting the problem."  Mr. Karabin enclosed a copy of Section 52.246-12 of the Federal Acquisition Regulations which states that government inspections are for the use of the government and do not constitute or imply acceptance of the inspected item at that time.  (Exh. 41 to Df's Response to Pl's CSMF).

17

On February 22, 2002, Lt. Commander S. Hinton, P.E., the Navy's Resident Officer in Charge of Construction, sent a letter to Mr. Schlosser, defendant's President, regarding his February 15, 2002 visit to plaintiff's New Castle facility in which he stated: "As a result of my visit, I am extremely concerned regarding the quality of components for the Acoustical Intake Sliding Doors. It appears to me that neither Fleming Steel nor your Quality Control representative fully understand the complexity and details of the requirements contained in the contract plans and specifications." Lt. Commander Hinton then listed the items which were considered unacceptable and "critical in obtaining a final accepted product," and he informed Mr. Schlosser that the Navy would "not entertain deviations to the contract requirements in order to complete the doors and the overall project within the current projected schedule." (Exh. 9 to Df's Response to Pl's CSMF).

On the same day, February 22, 2002, defendant sent a three-day cure notice to plaintiff pursuant to Article 8 of the subcontract between the parties. In summary, the notice stated that plaintiff's performance on the Oceana project was unsatisfactory; that, specifically, plaintiff's failure to fabricate acceptable splitter baffles continued to delay and was detrimental to the completion of the Oceana project; and that plaintiff's failure to substantially complete the splitter

baffles within three calendar days would result in the termination of plaintiff's subcontract with defendant for default.  (Pl's App., p. 222).

Mr. Kohn, plaintiff's President, responded to defendant's cure notice on February 25, 2002, stating, *inter alia*, that Lt. Commander Hinton, the Navy's Resident Officer in Charge of Construction, had changed the terms of the contract as implemented by Mr. Turknett over the previous nine months; that plaintiff continued to be willing to perform pursuant to the prior approval of the specimen splitter baffle which had been given by the Navy; that, even if the splitter baffles were refabricated, there was no guarantee they would work or appear any different; and that plaintiff would respond to defendant's cure notice promptly after the receipt of answers to various questions that were set forth in the response.  (Pl's App., pp. 223-24).

On February 28, 2002, the following letter was sent to plaintiff by defendant:

Gentlemen:

Fleming Steel Company has breached the Subcontract Agreement and pursuant to the cure notice sent to your office on Friday, February 22, 2002, we are hereby taking over that portion of work for default in accordance with Article 8 of the Subcontract Agreement.  Specifically, Fleming Steel Company's failure to fabricate acceptable splitter baffles.

As outlined in Article 8, Fleming Steel Company will be liable for all excess reprocurement costs, including

19

attorney's fees and consequential damages.  Fleming remains
responsible for all other work in their subcontract.

If you have any questions concerning this directive,
please contact the undersigned at 757-420-5048.

Sincerely,
W.M. SCHLOSSER COMPANY, INC.

s/Rich Karabin
Project Manager

(Pl's App., p. 225).

On March 8, 2002, Mr. Karabin sent a letter to Mr. Kohn in
which he stated that defendant would retract the default issued
to plaintiff on February 28, 2002 upon receipt of an executed
purchase order or subcontract with a third party to repair or
reconstruct the splitter baffles for the Oceana project in light
of Mr. Kohn's statement in his February 25th letter that
plaintiff could not guarantee the splitter baffles would work or
appear any different even if they were refabricated by plaintiff.
Mr. Karabin also stated that in order for the default to be
retracted, defendant would have to receive documentation of the
aforementioned purchase order or subcontract no later than March
13, 2002.  (Pl's App., p. 226).

On March 11, 2002, Mr. Kohn sent a letter to Mr. Schlosser
in which he proposed to repair the burn marks in the nine
splitter baffles that had not been refabricated by applying a
spray adhesive.  Mr. Kohn also stated that plaintiff could not
accept a conditional withdrawal of the default issued by

20

defendant because plaintiff had the "right to determine who will repair and/or re-manufacture replacement splitter baffles."  In addition, Mr. Kohn stated that plaintiff had stopped working on the splitter baffles on February 5, 2002 at defendant's direction; that plaintiff could not resume work on the splitter baffles until the default was withdrawn by defendant; and that defendant should advise plaintiff as soon as possible about the withdrawal of the default to enable plaintiff to finish the work on the splitter baffles.  (Pl's App., pp. 228-29).

On March 13, 2002, Mr. Kohn sent another letter to Mr. Schlosser indicating that the following issues remained unresolved:

*   *   *

1.  The default on the splitter baffles portion of our contract needs to be unconditionally withdrawn.

2.  Fleming is preparing the materials requested by the AROICC regarding the proposed repair to the burn marks in the second nine (unrepaired) splitter baffles.  This will be submitted shortly.

3.  An answer to our numerous requests to schedule a visit by Reggie Turknett to inspect the repaired splitter baffles should be provided.

4.  A definitive answer as to whether or not the demonstrated fit up of the modules is to be performed with or without the splitter baffles needs to be provided.

5.  Lastly, we need a written statement from W.M. Schlosser that any repaired and or newly made splitter baffles will be held to the tolerances established by the approved sample splitter baffle.

21

*   *   *

Mr. Kohn concluded his March 13th letter as follows: "These issues have been unanswered from some time.  The clock is ticking and they need to be resolved quickly.  We have been standing by since February 5th (when we were directed by W.M. Schlosser to stop work on the baffles) to resolve these issue (sic) and proceed.  Please give these matters your personal attention and let's move on with this project."[17]  (Pl's App., pp. 230-31).

---

[17]On March 15, 2002, Mr. Rapp, plaintiff's Vice President of Operations, submitted a report to Mr. Jones, defendant's Quality Control Manager, detailing the number and location of the burns in the fabric cloth of the splitter baffles, together with a data sheet from the manufacturer of the glue which plaintiff proposed to apply to resolve the burn issue and a sample of the glue itself.  With respect to the number of burns in the splitter baffles, Mr. Rapp's report indicates the following:

        Baffle 6A-1        11 burns
        Baffle 6A-2         3 burns
        Baffle 6A-3         5 burns
        Baffle 6A-4         6 burns
        Baffle 6A-5         1 burn
        Baffle 6A-6         7 burns
        Baffle 6A-7         2 burns
        Baffle 6A-8         9 burns
        Baffle 6A-9         5 burns
        Baffle 6A-10        6 burns
        Baffle 6A-11       29 burns
        Baffle 6A-12        1 burn
        Baffle 6A-13       12 burns
        Baffle 6A-14        6 burns
        Baffle 6A-15       10 burns
        Baffle 6A-16        1 burn
        Baffle 6A-17        3 burns
        Baffle 6A-18       11 burns

(Pl's App., pp. 232-33).

22

On March 19, 2002, Mr. Kohn sent the following letter to defendant:

Gentlemen:

Based upon our telephone conference on March 14, 2002, we were expecting last Friday to receive the letter withdrawing the notice of default.  Unfortunately it has still not been received.

It was also conveyed that (sic) Navy indicated that they would have a date set for Reggie Turknett's visit prior to the end of the week.  As of today, will (sic) still have no word on when that will occur.

Last Friday, we forwarded all of the materials requested by the AROICC for review on the proposed repair to the burn marks.

Please advise us on these outstanding matters as soon as possible as they have a direct bearing on the completion date.

If you should have any questions, please do not hesitate to contact us.

                    Yours very truly,
                    FLEMING STEEL COMPANY

                    s/Seth Kohn
                    President

(Pl's App., p. 234).

On the same day, March 19, 2002, Mr. Karabin, defendant's Project Manager, notified Mr. Kohn that "the letter of default for the lack of performance with regards to the splitter baffle fabrication is being withdrawn."  (Exh. 21 to Df's Response to Pl's CSMF).[18]

---

[18]Two days later, on March 21, 2002, Mr. Rapp, plaintiff's Vice President of Operations, sent a facsimile to defendant to

On March 22, 2002, the Navy sent a 10-day cure notice to defendant in which the Navy threatened to terminate defendant's prime contract "due to a number of quality issues specifically identified with the splitter baffles." (Exh. 42 to Df's Response to Pl's CSMF). In turn, on March 25, 2002, defendant sent another three-day cure notice to plaintiff pursuant to Article 8 of the parties' subcontract, reiterating its position that plaintiff's performance on the subcontract, *i.e.*, plaintiff's failure to fabricate acceptable splitter baffles, was unsatisfactory. (Pl's App., p. 236).

On March 27, 2002, plaintiff sent a facsimile to Morgan Fabrication, Inc. to which was attached a purchase order for the fabrication of nine splitter baffles for the acoustical intake sliding doors for the Oceana project at a cost of $3,500.00 each. The facsimile indicated that the original purchase order, the

_____

which a report was attached that showed the number and size of the fabric burns in the splitter baffles. With respect to the number of burns in the splitter baffles which had not been re-fabricated by plaintiff, the report forwarded by Mr. Rapp indicated the following:

    Baffle 6A-1              16 burns
    Baffle 6A-4               7 burns
    Baffle 6A-5               2 burns
    Baffle 6A-9               7 burns
    Baffle 6A-10              6 burns
    Baffle 6A-11             33 burns
    Baffle 6A-12              1 burn
    Baffle 6A-13             10 burns
    Baffle 6A-18             13 burns

(Exh. 13 to Df's Response to Pl's CSMF).

drawings and a copy of the specifications for the acoustical intake sliding doors were being sent under separate cover.[19] (Pl's App., pp. 237-38).

On March 29, 2002, defendant terminated its entire subcontract with plaintiff due to plaintiff's "failure to fabricate acceptable splitter baffles and complete the Intake door in compliance with the Contract."  (Pl's App., p. 239). Thereafter, on April 4, 2002, defendant entered into an agreement with Morgan Fabrication, Inc. (the same company to which plaintiff had issued a purchase order on March 29, 2002) for the fabrication of 18 splitter baffles for the acoustical intake sliding doors for the Oceana project in the total amount of $63,000.00.[20]  (Pl's App., p. 240).

---

[19]On March 27, 2002, a copy of the purchase order issued to Morgan Fabrication, Inc. by plaintiff was telefaxed to defendant's President, Mr. Schlosser, by Mr. Karabin, defendant's Project Manager, from defendant's office in southern Virginia. The cover to the facsimile stated:

"This purchase order was faxed to this office this afternoon.  It only indicates that Fleming is building nine baffles instead of the full eighteen.  In addition, there might be a few other issues with door parts that Fleming has failed to address.  This info is via a phone conversation with Bill Jones after he left the factory to head back to the airport.  I will have a full report from him by mid-morning.  There is more information that Seth has to provide before he satisfies all the requirements of the cure notice. I will keep you informed."

(Exh. 4 to Df's Response to Pl's CSMF).

[20]Plaintiff claims that the heat required to weld the perforated stainless steel sheets to the frames of the splitter

III

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the

---

baffles for the Oceana project exceeded the burning point of the fiberglass cloth required by the contract specifications, and that, as a result, heat transference would sometimes cause a discoloration or burn mark on the fiberglass cloth at the location of the weld because, under the specifications, the fiberglass cloth "had to be pressing against the top perforated stainless steel sheet when that sheet was welded to the stainless steel frame." (Pl's Brief in Supp., pp. 4-5). Defendant disputes this claim based, *inter alia*, on the deposition of Mr. Turknett during which he testified that the splitter baffles fabricated by Morgan Fabrication, Inc. did not contain burn marks. According to Mr. Turknett, the welding performed by Morgan Fabrication, Inc. on the splitter baffles was "absolutely beautiful." (Exh. 14 to Df's Response to Pl's CSMF, p. 46).

nonmoving party has failed to present evidence in support of some
element of its case on which it bears the ultimate burden of
proof.  *Id.* at 322-324.  Once the moving party has met its
burden, Fed.R.Civ.P. 56(e) "requires the nonmoving party to go
beyond the pleadings and by [its] own affidavits, or by the
'depositions, answers to interrogatories, and admissions on
file,' designate 'specific facts showing that there is a genuine
issue for trial.'" *Id.* at 324.  After the nonmoving party has
responded to the motion for summary judgment, the court must
grant summary judgment if there is no genuine issue of material
fact and the moving party is entitled to judgment as a matter of
law."  Fed.R.Civ.P. 56(c).  Keeping this standard in mind, the
Court turns to the parties' cross-motions for summary judgment.[21]

                                IV

     Article 11 of the parties' subcontract contains a choice of
law provision which states: "All disputes arising out of this
Subcontract agreement shall be resolved in accordance with the
laws of the Commonwealth of Virginia."  (Pl's App., p. 136).
Under Virginia law, a contract is said to be ambiguous if it is

_____

     [21]With respect to the propriety of summary judgment in a
breach of contract case, as noted by plaintiff, disputes
involving the interpretation of unambiguous contracts are
resolvable as a matter of law, and are, therefore, appropriate
cases for summary judgment.  *See* Tamarind Resort Assocs. v.
Government of the Virgin Islands, 138 F.3d 107, 110 (3d Cir.
1998).

                                27

susceptible to more than one reasonable interpretation, and whether an ambiguity exists is determined by giving fair consideration to the entire document and all the words used in it.  *See* <u>Superfos Investments Ltd. v. FirstMiss Fertilizer, Inc.</u>, 809 F.Supp 450, 457 (S.D.Miss.1992).  Moreover, a contract must be construed as written, and courts are not at liberty to add terms not included by the parties.  *See* <u>Quadros & Assocs., P.C. v. City of Hampton</u>, 268 Va. 50, 54, 597 S.E.2d 90, 93 (2004).  "The guiding light ... is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares."  <u>Golding v. Floyd</u>, 261 A. 190, 192, 539 S.E.2d 735, 737 (2001), *quoting* <u>W.F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc.</u>, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962).

V

Plaintiff asserts that defendant's termination of the parties' subcontract under Article 8 was wrongful, and, therefore, the termination should be treated as a termination for defendant's convenience under Article 29 of the subcontract, entitling plaintiff to recover damages for the work that had been completed as of the date of the alleged wrongful termination, plus 5% overhead and profit.  Plaintiff's argument in support of this position is two-fold.  First, plaintiff contends that

defendant's termination of the parties' subcontract was wrongful because neither cure notice issued to plaintiff by defendant set forth the reasons for which the subcontract was eventually terminated.  Second, plaintiff contends that defendant's termination of the parties' subcontract was wrongful because the splitter baffles which were rejected complied with the contract specifications.

i

Turning first to the cure notices issued to plaintiff by defendant, Article 8 of the parties' subcontract provided that plaintiff's failure to fulfill any of its obligations under the subcontract or the prime contract between defendant and the Navy would be deemed a breach of the subcontract.  Article 8 further provided that if plaintiff breached the subcontract, defendant *may* terminate plaintiff's right to proceed upon three calendar days' written cure notice and defendant *may* then have all or a portion of plaintiff's work completed.  Finally, Article 8 provided that defendant's wrongful termination of the parties' subcontract under Article 8 would be treated as a termination for defendant's convenience, entitling plaintiff to compensation in accordance with Article 29 of the subcontract.

Plaintiff asserts that there is no dispute defendant issued two written cure notices to plaintiff pursuant to Article 8 of the subcontract, and there is no dispute both written cure

29

notices refer only to the splitter baffles as the basis for the issuance of the cure notices.[22]   Plaintiff then asserts that the problem with defendant's subsequent termination of the parties' subcontract is "that the termination was not related to the written cure notices."  (Pl's Brief in Supp., pp. 18-19). Plaintiff's sole support for this assertion is the following excerpt from the deposition testimony of Mr. Schlosser, defendant's President:

\*   \*   \*

Q.  It might be easier if I ask you this way, did you decide to terminate – was the reason for that anything other than what is referred to in the Cure Notice?

A.  You mean – yes, I would say yes because – yes.  I would say yeah.

\*   \*   \*

(Pl's App., pp. 89-90).[23]

_____

[22]The cure notice issued on February 22, 2002 stated: "... Fleming Steel Company's failure to fabricate acceptable splitter baffles, as previously requested, continues to delay and is detrimental to the efficient completion of the project."  (Pl's App., p. 222).  The cure notice issued on March 25, 2002 stated: "... Fleming Steel Company's failure to fabricate acceptable splitter baffles, as previously requested, is detrimental to the efficient completion of the project.  See attached letter from the Navy with respect to the existing splitter baffles."  (Pl's App., p. 236).

[23]The entire excerpt of Mr. Schlosser's deposition testimony in this regard is as follows:

\*   \*   \*

Q.  Who made the decision to terminate the subcontract with Fleming Steel?

30

After consideration, the Court finds this argument

A.  I did.

Q.  Was it you alone or did you have a conversation with anyone at W.M. Schlosser about terminating the contract?

A.  I discussed it with Rich Karabin and my attorney and I ultimately made the decision about what we were going to do.

Q.  Why did you make that decision?

A.  Because they did not –

Q.  It might be easier if I ask you this way, did you decide to terminate – was the reason for that anything other than what is referred to in the Cure Notice?

A.  You mean – yes, I would say yes because – yes.  I would say yeah.

Q.  What other than the reasons set forth in the Cure Notice led to your determination to terminate the subcontract?

A.  Well, there's an attached letter from the Navy which you didn't give me as part of this, so I'm not sure what the letter from the Navy says.  Do you have that?

Q.  I might.

A.  But basically Fleming – why don't you repeat the question to make sure I answer the right question.

Q.  I asked if there was a reason other than what is referred to in the Cure Notice to terminate the contract.  You said there were and my question was what were those other reasons?

A.  A constant battle with Fleming about quality problems, quality control and the schedule.  They were so far behind schedule at this point – I think at this point they were at least six months behind schedule ....

                    *    *    *

(Pl's App., pp. 89-90).

unpersuasive.  First, as noted by defendant, "[n]owhere does
Article 8 require every breach, or even more than one breach, to
be listed [in a cure notice]."  (Df's Brief in Opp., p. 5).
Second, the Court agrees with defendant that the excerpt from Mr.
Schlosser's deposition testimony on which plaintiff relies to
support this argument is vague and the record contains
overwhelming evidence that the cure notices were issued by
defendant in response to plaintiff's failure to fabricate
splitter baffles which were acceptable to the Navy in a timely
manner.  No reasonable jury could find that plaintiff's failure
to fabricate acceptable splitter baffles was not a basis for
defendant's decision to terminate its subcontract with
plaintiff.[24]  Finally, the Court agrees with defendant that
plaintiff's interpretation of Mr. Schlosser's deposition

_____

[24]In this regard, the Court agrees with defendant that it is
significant that the first cure notice only threatened to remove
from plaintiff the portion of the subcontract dealing with the
splitter baffles if plaintiff did not satisfy the terms of the
cure notice which specifically referenced the splitter baffles.
(Df's Brief in Opp., p. 6).  The first cure notice stated: "[I]f
the splitter baffles are not substantially completed within three
(3) calendar days, or if adequate assurances of Fleming Steel
Company's ability and intent to timely and correctly perform this
work is not given within that time, *this portion* of Fleming's
work will be terminated for default...."  (Emphasis added).
(Pl's App., p. 222).  The Court also notes that the second cure
notice was issued to plaintiff by defendant shortly after
defendant received a cure notice from the Navy "due to a number
of quality issues specifically identified with splitter baffles."
(Exh. 42 to Df's Response to Pl's CSMF).  Under the
circumstances, it is disingenuous of plaintiff to claim that the
termination of its subcontract for the Oceana project was not
related to the written cure notices issued by defendant.

32

testimony is "illogical and unreasonable" because "[e]ven if 'other than' means 'instead of,' Mr. Schlosser's testimony still establishes the existence of '*reasons*' for the termination, and therefore does not support [plaintiff's] theory of a termination for convenience."  (Df's Brief in Opp., p. 8).

ii

Plaintiff also asserts that defendant's termination of the parties' subcontract under Article 8 was wrongful because the rejected splitter baffles were fabricated in accordance with the contract specifications and, therefore, the termination should be treated as a termination for defendant's convenience, entitling plaintiff to compensation in accordance with Article 29 of the subcontract.  In support of this argument, plaintiff relies on the undisputed fact that "burn marks" are not expressly prohibited in any of the contract specifications regarding the fiberglass cloth to be placed around the insulation in the splitter baffles.  After consideration, the Court also finds this argument unpersuasive.

As an initial matter, the Court notes its agreement with the parties that the contract specifications regarding the fiberglass cloth to be used in the splitter baffles for the acoustical intake sliding doors are clear and unambiguous.  The Court further agrees with defendant that "under any reasonable reading, the applicable specifications do in fact prohibit burns."  (Df's

33

Brief in Opp., p. 10).  Significantly, plaintiff's entire
alternative argument in support of summary judgment is based on
the failure of the contract specifications to prohibit "burn
marks."  Plaintiff never mentions the "burn holes" which
admittedly were present in the fiberglass cloth of the splitter
baffles fabricated by plaintiff.[25]  Paragraph 2.1.5.d of Section
13300 of the parties' subcontract required fiberglass cloth with,
*inter alia*, a thickness of 0.0065 inches.  Clearly, the areas of
the fiberglass cloth in the splitter baffles in which holes were
burnt during welding do not comply with this thickness
specification.  Similarly, paragraph 3.3.2.1 of Section 13300 of
the parties' subcontract mandated the placement of the fiberglass
cloth around the insulation in the splitter baffles "with extreme
care to prevent tears or wrinkles."  Under any reasonable
interpretation, burn holes would not comply with this
specification.  Based on the foregoing, plaintiff's motion for
summary judgment will be denied.[26]

---

[25]John List, plaintiff's Production Manager, testified
during his deposition that "[t]here were some spots where the
scorching burnt the fabric away."  (Exh. 12 to Df's Response to
Pl's CSMF, p. 50).  In addition, in a letter to defendant's
Quality Control Manager on October 31, 2001, Tom Rapp,
plaintiff's Vice President of Operations, stated that "the fabric
cloth within some of the fabricated splitter baffles is burnt
through in places."  (Exh. 15 to Df's Response to Pl's CSMF).

[26]With respect to the rejection of the nine re-fabricated
splitter baffles for failure to comply with the tolerance
requirements of the contract, plaintiff takes the position that
defendant may not rely on this fact as a basis for rejecting

VI

With respect to defendant's motion for partial summary judgment, defendant seeks a judgment in its favor as a matter of law on the following issue: whether the Navy's approval of the specimen splitter baffle relieved plaintiff of its duty to comply with the applicable contract specifications in the fabrication of subsequent splitter baffles?[27]  Defendant contends that based on the contract documents, including the Federal Acquisition Regulations which are incorporated therein, the answer to this question "is a resounding no."  (Df's Brief in Supp., p. 2).

In its brief in opposition to the motion for partial summary judgment, plaintiff states that defendant's motion "is based on a

---

these splitter baffles because defendant demanded the re-fabrication which resulted in the tolerance deviation.  (Pl's Brief in Supp., pp. 23-25).  After consideration, the Court also finds this argument meritless.  As noted by defendant, the tolerance deviations in the re-fabricated splitter baffles were the result of the repair method chosen by plaintiff.  There is no evidence that either defendant or the Navy dictated the manner in which the burned fiberglass cloth was to be replaced.  (Df's Brief in Opp., pp. 14-17).  In fact, the evidence establishes that it was plaintiff's President, Mr. Kohn, who chose the manner in which the Navy's complaints about the splitter baffles would be resolved.  (Pl's App., pp. 204-05).

    [27]According to defendant, the "crux of [plaintiff]'s position in this case is that (1) Navy inspectors approved, in May and June 2001, a 'sample' baffle that [plaintiff] had constructed; (2) the sample was out of contractually specified tolerance and had burn marks or holes in the fiberglass insulating material within the baffle; and therefore (3) the Navy was legally required to accept subsequently made baffles with those same characteristics, even if those characteristics were not in accordance with the applicable specifications."  (Df's Brief in Supp., p. 2).

mistaken view of [its] claim," specifically denying that it is claiming that the Navy's approval of the specimen splitter baffle resulted in a waiver of the contract specifications as to the subsequent splitter baffles.  (Pl's Brief in Opp., p. 5).  Based on this representation, defendant's motion for partial summary judgment will be denied as moot.

An order follows.