IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FLEMING STEEL COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 02-828 |
| | ) (Consolidated with Civil |
| W.M. SCHLOSSER COMPANY, INC., | ) Action No. 03-1338) |
| | ) |
| Defendant. | ) |

MEMORANDUM

I

Defendant, W.M. Schlosser Company, Inc., has filed two
motions in limine. For the reasons set forth below, the first
motion in limine (Doc. No. 66) will be denied and the second
motion in limine (Doc. No. 68) will be granted.

II

The undisputed facts of this case, which arises out of a
project for the construction of an aircraft acoustical enclosure,
or "hush house," for the United States Navy in Virginia Beach,
Virginia to test jet engines, were set forth at length in the
Court's Memorandum Opinion dated August 19, 2005, denying the
parties' cross-motions for summary judgment, and are attached
hereto as Exhibit 1.

1

III

<u>Defendant's Motion in Limine to Preclude Plaintiff from Arguing</u>
<u>that Manufacturing Baffles in Accordance with the Sample Baffle</u>
<u>Satisfied Its Obligations</u>

In its Pretrial Statement, Plaintiff asserted that it "acted
properly" under its subcontract with Defendant because (1) the
sample splitter baffle which was manufactured by Plaintiff and
approved by the Navy pursuant to the subcontract contained burn
marks on the fabric cloth; (2) all of the subsequent splitter
baffles manufactured by Plaintiff were as good as, or better
than, the approved sample splitter baffle; and (3) the contract
specifications contained nothing about burn marks on the fabric
cloth surrounding the insulation in the splitter baffles.[1]  (Doc.
No. 38, p. 8).  In response to this assertion, Defendant filed a
Motion for Partial Summary Judgment on the following issue: "Did
the Navy's approval of the sample baffle relieve Fleming of its
duty to comply with the applicable specifications in the

---

[1]With respect to nine splitter baffles which did not comply
with the tolerances set forth in the contract specifications
after re-fabrication, Plaintiff asserted that it acted properly
under the parties' subcontract because those splitter baffles
"had been in compliance and only went out of tolerance after
Fleming Steel was directed to replace the fabric cloth [due to
burn marks], which required re-welding."  (Doc. No. 38, p. 8).

2

fabrication of subsequent splitter baffles?"[2]   (Doc. No. 46, p.

2).

        In the brief filed in opposition to Defendant's Motion for

Partial Summary Judgment on this limited issue, Plaintiff stated

in relevant part:

                    *    *    *

        Schlosser's Motion for Summary Judgment is based on a
    mistaken view of Fleming Steel's claim.  Fleming Steel is
    not claiming that the written approval and acceptance of the
    sample splitter baffle resulted in a waiver by the Navy.  To
    the contrary, as more fully set forth in Fleming Steel's
    Motion for Summary Judgment and Brief in Support, there are
    two primary bases for Fleming Steel's claim.  Fleming
    Steel's first primary claim is that Schlosser admittedly
    terminated the subcontract for reasons other than what was
    set forth in Schlosser's notice to cure.  Consequently,
    under the express provisions of the subcontract, Schlosser's
    termination was a termination for convenience.  (Footnote
    omitted).

        Fleming Steel's second primary claim is that there is no
    dispute that the Specifications did not contain any
    provision that excluded burn marks on the fabric cloth of
    the splitter baffles.  Consequently, Schlosser's rejection
    of the splitter baffles allegedly because of burn marks on
    the fabric cloth was improper.

                    *    *    *

(Doc. No. 52, pp. 5-6).

In light of the foregoing statements by Plaintiff in its brief in

opposition to Defendant's Motion for Partial Summary Judgment,

_____

    [2]Defendant contended that based on the contract documents,
including the Federal Acquisition Regulations which are
incorporated therein, the answer to this question "is a
resounding no."  (Doc. No. 46, p. 2).

                            3

the Court denied Defendant's motion as moot in the Memorandum
Opinion filed on August 19, 2005.[3]

During a subsequent telephone conference among the Court and
counsel for the parties on November 3, 2005, Plaintiff's counsel
stated that Plaintiff was not claiming that the Navy's approval
of the sample splitter baffle relieved Plaintiff of complying
with the contract specifications.  Rather, Plaintiff was claiming
that approval of the sample splitter baffle set the standard for
acceptability of the remaining splitter baffles to be
manufactured under the parties' subcontract.

As a result of these seemingly inconsistent statements by
Plaintiff's counsel during the November 3, 2005 telephone
conference, Defendant filed the present motion in limine based on
the doctrine of judicial estoppel, seeking to preclude Plaintiff
from arguing that the fabrication of splitter baffles in
accordance with the sample splitter baffle satisfied Plaintiff's
obligations under the parties' subcontract, despite the fact that
the splitter baffles were not within the tolerances set forth in
the contract specifications and the fact that all of the splitter
baffles contained burn marks and holes.[4]  In the alternative,

---

[3]In the August 19, 2005 Memorandum Opinion, the Court also
denied Plaintiff's Motion for Summary Judgment on its "primary"
claims against Defendant.

[4]*See, e.g.*, Motley v. New Jersey State Police, 196 F.3d 160,
163 (3d Cir.1999)("[W]e opined in McNemar that judicial estoppel
may be invoked by a court at its discretion 'to preserve the

Defendant asserts that based on Plaintiff's "resurrect[ion of]
the same argument in slightly altered form after the Court's
adjudication of the summary judgment motions" (Doc. 67, p. 3),
the Court should permit Defendant to renew its Motion for Partial
Summary Judgment and decide the motion on the merits.

In response to Defendant's argument in support of the
present motion in limine, Plaintiff denies that it is changing
the position taken in response to Defendant's Motion for Partial
Summary Judgment, noting that, in the brief filed in opposition
to Defendant's motion, it also stated the following:

\*   \*   \*

Additionally, Fleming Steel is not claiming that the
approval and acceptance of the sample splitter baffle
resulted in a waiver of any standards or requirements.
Rather, the plain, unambiguous language of the
Specifications states that approval and acceptance of the
sample splitter baffle "shall serve as the reference for
establishing the acceptability of all fabricated acoustical
panels and baffles." Thus, approval of the sample splitter
baffle did not waive any standards of acceptability.
Rather, the approval set the standards of acceptability.

\*   \*   \*

(Doc. No. 52, p. 6).[5]

_____

integrity of the judicial system by preventing parties from
playing fast and loose with the courts in assuming inconsistent
positions, and ... with a recognition that *each case must be
decided upon its own particular facts and circumstances*.").

[5]In support of this argument, Plaintiff relies on paragraphs
1.4.2.1 and 3.3.2.1a of Section 13300 of the parties'
subcontract. These paragraphs provide in pertinent part:

\*   \*   \*

5

In light of the above-quoted statement which was set forth
in Plaintiff's brief in opposition to Defendant's Motion for
Partial Summary Judgment in addition to the earlier statements in
the brief on which the Court relied in denying Defendant's motion
as moot, the Court cannot conclude that Plaintiff is "playing
fast and loose" with the Court as asserted by Defendant.
Therefore, the Court declines to apply the doctrine of judicial
estoppel to preclude this argument and Defendant's first motion
in limine will be denied. However, in light of the Court's
failure to grasp entirely Plaintiff's argument regarding the
effect of the Navy's approval of the sample splitter baffle on

---

1.4.2.1 Specimen Acoustical Panel and Baffle

Prior to fabrication of acoustical panels and baffles to be
used in the acoustical intake sliding doors, the
manufacturer shall fabricate a full size specimen of a
typical acoustical panel and baffle *which shall serve as the
reference for establishing the acceptability of all
fabricated acoustical panels and baffles*.... (Emphasis
added).

\*   \*   \*

3.3.2.1 Acoustical Panels, Splitter Baffles and Acoustical
Turning Vanes

Fabricate as indicated and as specified herein:

a.   ... The approved panel and splitter baffle *shall serve
     as the reference for establishing the acceptability of
     all fabricated panels*.... (Emphasis added).

\*   \*   \*

(Memorandum Opinion, 8/19/05, pp. 11-12).

6

the fabrication of subsequent splitter baffles under the parties'
subcontract at the time Defendant's Motion for Partial Summary
Judgment was denied, the Court concludes that Defendant should be
given the opportunity to renew its Motion for Partial Summary
Judgment on the limited issue of "[w]hether the Navy's approval
of the sample baffle relieved Fleming of its duty to comply with
the applicable specifications in the fabrication of subsequent
splitter baffles?"

## Defendant's Motion in Limine to Preclude Plaintiff from Arguing That It Was Impossible to Manufacture Splitter Baffles in Accordance with the Contract Specifications

In its Motion for Summary Judgment and Pretrial Statement,
Plaintiff asserts that due to the contract specification
requiring the insulation in the splitter baffles to exert a
uniform pressure on the surrounding perforated stainless steel
sheets, it was impossible to avoid burn marks on the cloth in
which the insulation was wrapped because, unlike other metals
which dissipate or spread heat, stainless steel localizes heat.[6]

---

[6]Specifically, in its Pretrial Statement, Plaintiff makes
the following argument:

"Unlike other metals, such as carbon steel, stainless
steel does not dissipate or spread heat. Rather, stainless
steel localizes heat. Consequently, when the perforated
sheet was welded to the frame of the baffle, the heat would
be transferred to the cloth fabric as it pressed against the
perforated sheet at the point of the weld. The heat needed
to weld the perforated sheet to the frame, however, exceeded
the burning point of the cloth fabric required by the
specifications. As a result, the heat transference would
sometimes cause a discoloration burn mark on the cloth

7

(Doc. No. 38, p. 2 and Doc. No. 42, pp. 4-5). In support of this assertion, plaintiff relies on the deposition testimony of its President, Seth Kohn.

In its second motion in limine, Defendant asserts that Plaintiff should be precluded from making the foregoing argument at trial for two reasons. First, Defendant contends that Plaintiff's "impossibility" argument is "a classic example of a matter requiring expert testimony, yet [Plaintiff] has never designated an expert or otherwise indicated an intent to use an expert witness."[7] (Doc. No. 69, p. 2). Second, Defendant contends that, even if Plaintiff had designated an expert to testify regarding its claim of "impossibility," it still should

---

fabric at the location of the weld."

(Doc. No. 38, p. 2).

This argument was repeated almost verbatim in Plaintiff's Motion for Summary Judgment. (Doc. No. 42, p. 4).

[7]In this connection, Rule 702 of the Federal Rules of Evidence provides:

**Rule 702. Testimony by Experts**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

be precluded from making such an argument based on the lack of factual support in the record for the argument.

After consideration, the Court concludes that Defendant's second motion in limine should be granted. First, the Court agrees with Defendant that Plaintiff's "impossibility" argument is based on the unique characteristics of stainless steel. Therefore, without the testimony of an expert, any claim of objective "impossibility" by Plaintiff due to the manner in which stainless steel reacts to heat during the welding process would be speculative.[8]  Second, the Court agrees with Defendant that Mr. Kohn, Plaintiff's President, does not qualify as an expert regarding the effect of heat during the welding process on the unique characteristics of stainless steel,[9] and, further, that

---

[8]Under Virginia law, which applies in this case, breach of contract is excused only by "objective" impossibility of performance. *See, e.g.*, Ballou v. Basic Construction Co., 407 F.2d 1137, 1140-41 (4th Cir.1969)("It is well settled, as a general rule, that if performance is rendered merely difficult or burdensome or unprofitable, the promisor is not excused, and the same is true generally if the impossibility is personal to the promisor, and does not inhere in the nature of the act to be performed.").

[9]In summary, during his deposition, Mr. Kohn testified that: (a) his experience in welding basically was limited to training in shop class in high school and he was "not very good;" (b) he does not have any certifications in welding; (c) "from what [he] understands," stainless steel is "a little bit more difficult" to weld because it localizes heat in a very small area; (d) although he looked at the work being performed in Plaintiff's shop on the parties' subcontract every day, he was not qualified to comment on the completeness or quality of the work, which is "why [he has] people hired;" (e) he could not answer the question whether it was "virtually impossible" to meet the contract specifications

9

Mr. Kohn's opinion would not be admissible under Rule 701 of the
Federal Rules of Evidence regarding opinion testimony by lay
witnesses because the opinion would be "based on scientific,
technical, or other specialized knowledge within the scope of
Rule 702."[10]  Finally, the Court agrees with Defendant that even
if Plaintiff had designated an expert in connection with its
"impossibility" argument, such testimony nevertheless would be
inadmissible because the argument is unsupported, indeed
contradicted, by the factual record in this case.  *See, e.g.,*
Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d
Cir.2002), *citing*, Elcock v. Kmart Corp., 233 F.3d 734, 756 n.13
(3d Cir. 2000)("It is an abuse of discretion to admit expert
testimony which is based on assumptions lacking any factual

---

regarding tolerance because of the way in which stainless steel
reacts to heat from the welding process because he is "not a
certified welder;" and (f) he could not testify as to whether
there are ways to minimize warpage during the welding of
stainless steel because he is "not a qualified stainless steel
welder."  (Doc. No. 69, Exh. 2, pp. 10-13, 21, 35, 37).

[10]Rule 701 of the Federal Rules of Evidence provides in its
entirety as follows:

**Rule 701.  Opinion Testimony by Lay Witnesses**

   If the witness is not testifying as an expert, the
witness' testimony in the form of opinions or inferences is
limited to those opinions or inferences which are (a)
rationally based on the perception of the witness, (b)
helpful to a clear understanding of the witness' testimony
or the determination of a fact in issue, and (c) *not* based
on scientific, technical, or other specialized knowledge
within the scope of Rule 702.   (Emphasis added).

10

foundation in the record."). Specifically, Defendant has proffered evidence that the splitter baffles manufactured by Morgan Fabricators, the company which took over fabrication of the splitter baffles for the Navy "hush house" in Virginia Beach, Virginia after Defendant terminated Plaintiff's subcontract, were fully compliant with the contract specifications. (Doc. No. 69, Exh. 3). In addition, a report prepared for Defendant by Tom Rapp, Plaintiff's Shop Supervisor, on March 21, 2002, indicates that there were sections of the splitter baffles which were welded by Plaintiff without resulting burn marks. (Doc. No. 69, Exh. 4).

An appropriate order follows.

Arthur J. Schwab
United States District Judge
for
William L. Standish
United States District Judge

11

EXHIBIT 1

For purposes of the present motions, the following facts are undisputed:

An aircraft acoustical enclosure, also known as a "hush house," is a structure that is built to be as soundproof as possible. The United States Navy ("the Navy") utilizes aircraft acoustical enclosures for engine-in-aircraft high power testing to minimize the disturbance that such testing causes to neighbors. (Pl's CSMF, ¶¶ 15-16, Exh. 5 to Df's Response to Pl's CSMF, p. 4).

On December 29, 1999, the Navy issued a solicitation in connection with the construction of a 12,000 square foot prefabricated steel and concrete aircraft acoustical enclosure at the Oceana Naval Air Station in Virginia Beach, Virginia ("the Oceana project"). Defendant, which is in the business of performing general contracting work, submitted a bid in response to the solicitation, and, on February 17, 2000, the Navy awarded the prime contract for the Oceana project to defendant.[11]  The scheduled completion date for the Oceana project was October 17, 2001. (Pl's CSMF, ¶¶ 7-8, 10, Pl's App., p. 135, Exh. 2 to Df's Amended Statement of Material Facts not in Dispute, ¶¶ 6-9).

---

[11]Defendant is a Maryland corporation with a principal place of business in Hyattsville, Maryland. Since 1987, Andrew Schlosser has been defendant's President. (Amended Complaint, ¶ 4, Answer, ¶ 4, Exh. 34 to Df's Response to Pl's CSMF, ¶ 1, Exh. 2 to Df's Amended Statement of Material Facts not in Dispute, ¶ 8).

Plaintiff is in the business of fabricating custom doors for facilities, such as steel mills, manufacturing plants and aircraft hangars.[12]   (Pl's CSMF, ¶ 2).   On June 12, 2000, defendant entered into a subcontract with plaintiff pursuant to which plaintiff was responsible for fabricating the acoustical intake sliding doors for the Oceana project.   Under the subcontract, plaintiff was to be paid $1,655,357 for the fabrication.[13]   (Pl's CSMF, ¶¶ 17, 20).   With respect to breaches, Article 8 of the parties' subcontract provided:

\*   \*   \*

8.   The following shall be deemed a breach of this agreement: Failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning Subcontractor's work or responsibilities; Failure to pay for labor or materials, payroll taxes, contributions or insurance premiums; Interference with the performance of the work by others for any reason; Failure to maintain Contractor's progress schedule in effect at that time; Any act of insolvency or bankruptcy; Failure to provide adequate manpower on site; Failure to maintain valid and enforceable payment, performance and maintenance bonds throughout

---

[12]Plaintiff is a Pennsylvania corporation with a principal place of business in New Castle, Pennsylvania.   Seth Kohn is plaintiff's President.   (Pl's CSMF, ¶¶ 1, 4, Exh. 3 to Df's Amended Statement of Material Facts not in Dispute, ¶ 4).

[13]Article 15 of the parties' subcontract incorporated the prime contract between defendant and the Navy by reference. (Pl's App., p. 136).   Moreover, the Solicitation, Offer and Award for the prime contract incorporated clauses of the Federal Acquisition Regulations (some clauses were incorporated by reference, while other clauses were incorporated by full text). (Exh. 9 to Df's Amended Statement of Material Facts not in Dispute, ¶ 6).

the duration of the project. If Subcontractor breaches this Subcontract, Contractor may terminate Subcontractor's right to proceed upon three (3) calendar days' written cure notice. Contractor may then have all or a portion of Subcontractor's work completed and may use Subcontractor's materials, supplies, tools and equipment to complete. In this regard, Subcontractor acknowledges that it is reasonable to employ a reputable substitute contractor on a cost-plus or time and material basis to complete all or part of Subcontractor's work. Subcontractor (and its surety) shall continue to be liable for all costs to complete and any damage and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach, without waiver of any other rights or remedies available to Contractor, including the right to set off any collections or any funds which may be due to Subcontractor under other subcontracts with Contractor. All notices will be sent to the address indicated above unless otherwise advised by the Subcontractor. **If it is determined that Contractor wrongfully terminated this Subcontract under this Article, that action shall be treated as a termination for the Contractor's convenience and Subcontractor shall be entitled to the compensation set forth in Article 29 of this Agreement.**[14] (Emphasis added).

---

[14]Article 29 of the parties' subcontract provided:

\* \* \*

29. Contractor shall have the right to terminate this agreement for its own convenience for any reason by giving notice of termination. Notice of termination is effective upon receipt by Subcontractor. If the Termination for Convenience is initiated by the Owner, settlement shall be accomplished in accordance with the Termination for Convenience clause in the Prime Contract. If there is no Termination for Convenience clause in the prime contract, or **if the termination is initiated by the Contractor, the Subcontractor shall be paid only the actual cost for work and labor in place, plus five percent (5%) overhead and profit, or a prorated percentage of the Subcontract equal to the percentage of completion, whichever is less.** In no event shall subcontractor be entitled to recover unabsorbed overhead or anticipatory profits on

* * *

(Pl's App., p. 136).

The acoustical intake sliding doors to be fabricated by
plaintiff for the Oceana project were divided into modules and
each module consisted of several components, including acoustical
splitter baffles.[15]  To construct a splitter baffle, a perforated
stainless steel sheet is welded onto one side of a stainless
steel channel frame.  Insulation, which has been wrapped in
fiberglass cloth,[16] is then inserted into the frame and another

---

            unperformed portions of the work.  Contractor shall
            have the right to audit and review Subcontractor's
            books and records at any time.  (Emphasis added).

                        * * *

(Pl's App., p. 138).

        [15]Other components of the modules for the acoustical intake
sliding doors included acoustical panels and acoustical turning
vanes.  The construction of these components was similar to the
construction of the splitter baffles.  (Pl's CSMF, ¶ 25).

        [16]The type of fiberglass cloth to be used in the splitter
baffles was specified in the parties' subcontract.  Specifically,
Section 2.1.5.d of Section 13300 of the subcontract provided:

                        * * *

        d.  Glass Fiber Cloth: Provide fiberglass cloth with the
            following properties: count - 34x22; warp - 75/1/0;
            filling - 75/1/0; weight - 5.45 ounces per square yard;
            thickness - 0.0065-inches; tensile strength - 225x195
            pounds per inch, greige, and shall be style No. 7626
            plain weave fiberglass.  Manufacturers presently
            weaving this style fiberglass cloth include: B.G.F.
            Industries Inc., 301 N. Elm Street, PO Box 21207,
            Greensboro, North Carolina 27401 and Clark - Schwebel
            Inc., 2200 S. Murray Avenue, PO Box 2627, Anderson,
            South Carolina 29622.  Notwithstanding any other
            requirements of this contract, no other product will be

perforated stainless steel sheet is welded onto the other side of the frame.[17]  The parties' subcontract required plaintiff to fabricate 18 splitter baffles for the acoustical intake sliding doors for the Oceana project.[18]  (Pl's CSMF, ¶¶ 20-24).

Specifications for the acoustical intake sliding doors were set forth in Section 13300 of the parties' subcontract and included the following:

SECTION 13300

ACOUSTICAL INTAKE SLIDING DOORS

*    *    *

1.4.2.1  Specimen Acoustical Panel and Baffle

Prior to fabrication of acoustical panels and baffles to be used in the acoustical intake sliding doors, the manufacturer shall fabricate a full size specimen of a typical acoustical panel and baffle which shall be approved by the Contracting Officer and which shall serve as the reference for establishing the acceptability of all fabricated acoustical panels and baffles.  The specimen acoustical panel and baffle shall conform to all of the requirements of the contract including quality control, testing, form, fit, size and function and shall meet all of the requirements of the contract documents.  Fabrication and all contract document requirements must be satisfied and

accepted.

*    *    *

(Pl's CSMF, ¶ 42, Pl's App., p. 154).

[17]The splitter baffles for the Oceana project were 11'6" x 8'6" x 4.5", and each splitter baffle weighed approximately 550 pounds.  (Exh. 3 to Df's Amended Statement of Material Facts not in Dispute, ¶ 22).

[18]According to defendant, the splitter baffles are installed in the acoustical intake sliding doors to assure proper air flow to the jet engines being tested.  (Df's Brief in Opp., p. 2).

complete prior to submission of specimens for approval. All acoustical panels and baffles shall be continuously inspected during fabrication to assure that the packed insulation exerts a uniform outward pressure on the face sheets and that there are no visible voids or wrinkles in the fiberglass cloth facing.

\*   \*   \*

3.3.2.1  Acoustical Panels, Splitter Baffles and Acoustical Turning Vanes

Fabricate as indicated and as specified herein:

a.   Acoustical material for installation in wall panels, splitter baffles and turning vanes shall fill the void space to the full density indicated. Acoustical material within the perforated sheet facing shall be so fabricated as to be compressed and exert pressure on the sheets and packing to prevent flutter due to air pressure and velocity. The sheets, or combination of sheets, shall be formed and fastened to provide a rigid integral panel. The cloth fabric shall be placed around the acoustical insulation with extreme care to prevent tears or wrinkles. A specimen acoustical panel and splitter baffle shall be fabricated and approved by the Contracting Contracting (sic) Officer prior to fabrication of the panels and splitter baffles to be used in the door. The approved panel and splitter baffle shall serve as the reference for establishing the acceptability of all fabricated panels. All acoustical panels, splitter baffles, and acoustical turning vanes shall be continuously inspected during fabrication to assure that the packed insulation exerts a uniform outward pressure on the face sheets and that there are no visible voids or wrinkles in the fiberglass cloth facing.

\*   \*   \*

(Pl's App., pp. 151-52, 172).[19]

---

[19]Section 1.4.1.3 of Section 13300 of the parties' subcontract, relating to Welding Inspection and Testing, provided in part: "Nondestructive tests for structural steel fabrication shall be performed by an independent testing laboratory approved by the Contracting Officer, engaged by the Contractor at the expense of the Contractor." Pursuant to this provision, plaintiff hired the Non-Destructive Testing Group to conduct testing on the welds of the components of the acoustical intake

Plaintiff fabricated a specimen splitter baffle,[20] and, on May 31, 2001, Reginald E. Turknett, a consultant for the Navy's Engineering Service Center and a representative of the Navy's Contracting Officer, conducted a site visit to plaintiff's New Castle facility for the purpose of approving the specimen splitter baffle pursuant to paragraph 1.4.2.1 of Section 13300 of the subcontract between the parties. Mr. Turknett reviewed the specimen splitter baffle, and, although he noted various discrepancies which required correction, Mr. Turknett found the specimen splitter baffle to be acceptable. (Pl's App., pp. 195-96). By letter dated June 4, 2001, Wirt Shinault, P.E., the Navy's Resident Engineer in Charge of Construction, notified defendant that the specimen splitter baffle fabricated by plaintiff had been inspected on May 31, 2001 and was found to be acceptable. (Pl's CSMF, ¶ 13, Pl's App., p. 194).

On June 13, 2001, Mr. Turknett conducted another site visit to plaintiff's New Castle facility for the purpose of (a) approving the specimen acoustical panel fabricated by plaintiff and (b) reviewing the specimen splitter baffle again following

_____

sliding doors for the Oceana project. (Pl's CSMF, ¶ 32).

[20]Plaintiff originally subcontracted the fabrication of the splitter baffles to a company called Techniweld. However, Techniweld defaulted on its subcontract with plaintiff by performing substandard quality work. As a result, plaintiff took over fabrication of the splitter baffles. (Pl's CSMF, ¶¶ 26-27).

installation of the leading and trailing edges.[21]  In his report
concerning this site visit, Mr. Turknett noted that the specimen
acoustical panel was reviewed and found to be acceptable,
although he noted several discrepancies which needed correction.
As to the specimen splitter baffle, Mr. Turknett noted one
discrepancy which required correction.  (Pl's App., pp. 198-99).
By letter dated June 15, 2001, Mr. Shinault notified defendant
that the specimen acoustical panel fabricated by plaintiff had
been inspected on June 13, 2001 and was found to be acceptable.
Mr. Shinault's June 15th letter does not mention the specimen
splitter baffle which had been re-inspected.  (Pl's App., p.
197).

On August 30, 2001, Mr. Shinault sent a letter to defendant
regarding an August 28th inspection conducted by a representative
of the Navy's Contracting Officer at plaintiff's New Castle
facility.  The letter stated in part:

                    *    *    *

During a review of the Acoustical Intake Sliding Doors
offsite work for Contract Specification compliance and
status of Door Manufacturing process, made on August 28,
2001 by the Contracting Officer's Representative in
accordance with Contract Specification 01450 par. 1.10.3
Follow-Up Inspections (sic).  It is felt that the Quality
Control is not providing the same Quality that went into
manufacturing the samples that were inspected on May 31,
2001, and June 13, 2001.  The following items were looked at

_____

[21]At the time of Mr. Turknett's initial site visit to
plaintiff's New Castle facility on May 31, 2001 to inspect the
specimen splitter baffle, the leading and trailing edges had not
been installed.

in Fleming Steels (sic) shop on August 28, 2001 and need
your immediate concern:

*  *  *

2.  Splitter Baffle Piece No. 6-A-1: a) Insulation Fabric
    burned through needs to be replaced, b) Check all
    fabricated pieces for burn through and replace, c)
    Numerous spots of buckling were measured in the
    perforated sheet some at 7/8" [-] correct as necessary
    to meet specifications, d) Clean welds in corners of
    panels, e) edge clearance on fit up incorrect, and
    crown in panel measured at 3/8" [-] these items need to
    be corrected, f) Leading edges do not fit up with panel
    correctly, g) check tolerances with specifications on
    all of above items.

*  *  *

As of this date the schedule provided from your W.M.
Schlosser states the Acoustical Doors will be delivered and
erected in time to meet the Contract Completion date.  I do
understand that you have been told by your Fleming Steel
that this is not going to happen based on his inability to
meet milestone dates he set for himself, and despite his
promises to this office to deliver the product on schedule.

Provide a Schedule outlining the impact to the overall
project by September 7, 2001.  You are reminded that the
Contract Completion date is October 17, 2001 and liquidated
damages are $4,583.00.[22]  As always we strive to provide you
the necessary information and cooperation to keep the
project Quality per Contract Requirements, and the Project
on Schedule.

                    Sincerely,
                    s/Wirt Shinault, P.E.
                    Resident Engineer in Charge of
                    Construction

(Pl's App., pp. 200-01).

The concerns raised in Mr. Shinault's August 30th letter

were communicated to plaintiff, and, by letter to defendant dated

_____

[22]Liquidated damages under the prime contract between
defendant and the Navy were $4,583.00 for each day of delay.
(Exh. 5 to Df's Response to Pl's CSMF, p. 11).

September 6, 2001, plaintiff's President, Seth Kohn, responded to
those concerns.[23]  With regard to the Navy's complaints about
splitter baffle No. 6-A-1, Mr. Kohn stated:

\*    \*    \*

2.    SPLITTER BAFFLE PIECE NO. 6A-1

    A.    The trim piece and perforated sheet will be
removed, the fabric cloth will be replaced with
new cloth and the perforated sheet and trim piece
will be re-installed and weld tested.  To further
protect the fabric from being burned, we will
continue to place a stainless steel plate over the
perforated sheet to protect the fabric.

    B.    The balance of baffles will be inspected for this
condition.

    C.    To meet the specification requirements, we will
loosen and re-attach the perforated sheets to
correct the buckling condition.  This work will be
done in accordance with the proper procedures.

    D.    Cleaning was not complete at the time the baffle
was viewed.  The corners will be cleaned at the
proper time.

    E.    During operations stated in A & C, this clearance
problem will be corrected.

    F.    The leading edge will be removed, trimmed to the
low end of +/- 1/8" to match the baffle
dimensions.

_____

[23]In his letter, Mr. Kohn initially took exception to the
following statement in Mr. Shinault's August 30th letter: "It is
felt that the Quality Control is not providing the same Quality
that went into manufacturing the samples that were inspected on
May 31, 2001, and June 13, 2001."  According to Mr. Kohn, the
August 28th inspection was not a scheduled formal inspection.
Rather, it was an interim visit to determine the progress of the
work being performed by plaintiff, and Mr. Kohn maintained that,
as a result, none of the materials that were examined and
mentioned in Mr. Shinault's letter were complete and ready for an
official inspection.  (Pl's App., p. 202).

G.    Quality Control will conduct inspections at the
      appropriate times.

                    *    *    *

(Pl's App., pp. 202-07).

On October 31, 2001, Tom Rapp, plaintiff's Vice President of

Operations, wrote the following letter to William Jones,

defendant's Quality Control Manager:

Dear William:

As you know, the fabric cloth within some of the fabricated
splitter baffles is burnt through in places. Fleming has
made inquiries as to what might be available to patch these
burn through holes rather than remove and replace the entire
fabric.  The fabric manufacturer directed us to Adhesive
Research, Inc. who manufactures adhesive tapes used to
splice the fabric cloth in question.

Enclosed is a product data sheet and sample of the material
Arclad 7353.

Also enclosed are three samples of other patching materials.
Unfortunately, product data sheets are not available for
these products.

Please notify us as soon as you can as to whether any of
these products would be acceptable.

Should you have any questions or require additional
information, please do not hesitate to contact us.

                         Yours very truly,
                         FLEMING STEEL COMPANY
                         s/Tom Rapp
                         Vice President, Operations

(Pl's App., p. 210).[24]

_____

[24]With respect to the significant lapse of time between Mr.
Kohn's September 6th letter to defendant, and Mr. Rapp's October
31st letter to defendant, Mr. Rapp testified that he had been out
of the office for 6 to 8 weeks due to illness.  (Pl's App., pp.
46-47).  When he returned to work, Mr. Rapp informed Mr. Kohn
that removing the stainless steel sheets on the splitter baffles,

On November 5, 2001, Mr. Jones responded to Mr. Rapp's

October 31st letter with the following facsimile:

Tom,

Request for authorization to utilize patching material for
the burned holes in the splitter baffles is denied.   Please
continue with initial direction to replace the fabric cloth
for the affected areas.

Thank you,
William Jones, CQC Manager

(Pl's App., p. 212).

Thereafter, plaintiff re-fabricated nine of the 18 splitter

baffles.   (Pl's CSMF, ¶ 92).

On February 15, 2002, representatives of the Navy and

representatives of defendant visited plaintiff's New Castle

facility for the purpose of inspecting the nine splitter baffles

which had been re-fabricated to repair the burn holes in the

fiberglass cloth surrounding the insulation.   Subsequently, Mr.

Jones, one of defendant's representatives during the February

15th visit, prepared a report in which he described in detail his

inspection of each of the nine re-fabricated splitter baffles.

Mr. Jones then rendered the following conclusion:

* * *

### Conclusion

---

replacing the burned fiberglass cloth surrounding the insulation
and re-welding the stainless steel sheets to the frames would
cause severe distortions to the splitter baffles.   (Pl's CSMF,
¶ 83).   As a result, plaintiff explored other means to remedy the
burns in the fiberglass cloth surrounding the insulation.   (Pl's
CSMF, ¶ 84).

In general, all 9 of the inspected Splitter baffles that have been reworked to (sic) due burned fabric underneath the perforated stainless steel sheeting, display various amounts of bulges and deflections in the horizontal flatness areas, display irregular or "out of shape" radius pieces for the leading and trailing edges, are dimensionally smaller than specified, and the leading and trailing edges, for the most part, are no longer lapped onto the margins of the perforated sheeting which has exposed the "C" channel underneath it.

Furthermore, I have concluded that these 9 Splitter Baffles are not within the tolerances specified by the contract drawings, contract specifications, or approved Splitter Baffle sample and shall not be utilized for installation.

*   *   *

(Pl's App., pp. 212-26).

On February 15, 2002, the date of the inspection of the nine re-fabricated splitter baffles at plaintiff's New Castle facility, Mr. Shinault, the Navy's Resident Engineer in Charge of Construction, sent a letter to Mr. Karabin, defendant's Project Manager, indicating that the following items which were observed during the February 15th inspection needed immediate attention:

*   *   *

1. Welds were improperly spaced on turning vane no. 2.
2. Plug welds were (sic) on leading edge of turning vane no. 5 were improper.
3. Acoustical Panels in rain cap are not properly stuffed; insulation is not against outside of Panel.
4. Improper fit up of edges on splitter baffles.
5. Deformed perforated sheets out of tolerance on splitter baffles.
6. Need certifications for all welders.
7. You are reminded of the information required per contract specification section 13300 par. 1.3.4.6, Shop Inspection and Test Results, prior to factory demonstration.

*   *   *

Mr. Shinault concluded his letter to Mr. Karabin as follows: "In respect to the above listed items provide information on how these items will be corrected, by February 22, 2002." (Exh. 8 to Df's Response to Pl's CSMF).

On February 20 and February 21, 2002, Mr. Jones, defendant's Quality Control Manager, returned to plaintiff's New Castle facility to inspect the other nine splitter baffles that had been fabricated by plaintiff, including the specimen splitter baffle. Mr. Jones began his report concerning this inspection as follows:

> The purpose of this visit to Fleming Steel's shop was to conduct a detailed inspection of the Splitter Baffles that reflect, "burned" or "charred" areas of fiberglass cloth underneath the stainless steel perforated sheet, to determine whether or not the areas of concern actually contain holes in the fiberglass cloth.

\*    \*    \*

Mr. Jones then described his findings as to each of the nine splitter baffles, and set forth his conclusion as follows:[25]

_____

[25]According to his report, Mr. Jones' inspection on February 20 and February 21, 2002 of the 9 splitter baffles that had not been re-fabricated by plaintiff revealed the following number of burn holes:

```
Splitter Baffle 1.6a-13 (sample) -      10
Splitter Baffle 2.6a-18          -      13
Splitter Baffle 3.6a-12          -       1
Splitter Baffle 4.6a-4           -       7
Splitter Baffle 5.6a-11          -      32
Splitter Baffle 6.6a-5           -       2
Splitter Baffle 7.6a-9           -       5
Splitter Baffle 8.6a-10          -       6
Splitter Baffle 9.6a-1           -      13
```

(Pl's App., pp. 217-18).

### Conclusion:

Dimensionally, (including horizontal flatness), the 9 inspected Splitter Baffles are as good and in some cases better, than the dimensions reflected in the approved sample panel, piece 6a-13.

However, due to the defective material within the Splitter Baffles, the above-mentioned 9 baffles are unacceptable and shall not be utilized for installation.

**This concludes that all 18 fabricated Splitter Baffles have not been fabricated within the tolerances and guidelines set forth in the Contract Drawings and/or Contract Specifications and are unacceptable.**

(Pl's App., pp. 217-20).

On February 21, 2002, Mr. Rapp, plaintiff's Vice President

of Operations, sent the following facsimile to Mr. Karabin,

defendant's Project Manager, concerning the Navy's prior approval

of the specimen splitter baffle and the subsequent rejection of

all 18 splitter baffles fabricated by plaintiff:

Dear Rich,

Attached are copies of two (2) faxes relative to the referenced specimen approval.

The first report indicates that the baffle is approved.  At the time of the first approval inspection, the leading and trailing edge trim was not attached.

The second report deals mainly with the approval of the Specimen Acoustical Panel, however, page 2 reports that the Specimen Acoustical Baffle was reviewed with the leading and trailing edge trim attached and approved with only one discrepancy noted.  Nothing was said or reported concerning burns in the fiberglass cloth.  No work has been done on the Specimen Acoustical Baffle since the date of its approval (June 15, 2001).  How does it happen that a specimen can be approved by both Reggie and Wirt in June of 2001, and the same piece be rejected in February of 2002?

The nine baffles re-inspected yesterday are all within the same tolerance of the approved specimen.  The cloth is in the same relative condition on all nine of these baffles as

well.  The first nine baffles that were repaired and are now
out of specified tolerance were within tolerance prior to
replacing the cloth and re-welding.  The cloth that was
replaced was in the same condition as that of the approved
specimen baffle.

Sincerely,
s/Tom Rapp

(Pl's App., p. 221).[26]

On February 22, 2002, Lt. Commander S. Hinton, P.E., the

Navy's Resident Officer in Charge of Construction, sent a letter

to Mr. Schlosser, defendant's President, regarding his February

15, 2002 visit to plaintiff's New Castle facility in which he

stated: "As a result of my visit, I am extremely concerned

regarding the quality of components for the Acoustical Intake

Sliding Doors.  It appears to me that neither Fleming Steel nor

your Quality Control representative fully understand the

complexity and details of the requirements contained in the

contract plans and specifications."  Lt. Commander Hinton then

listed the items which were considered unacceptable and "critical

in obtaining a final accepted product," and he informed Mr.

_____

[26]Mr. Karabin responded to Mr. Rapp's facsimile on the same
day, February 21, 2002.  While noting that the Navy's letters
regarding the two inspections of the specimen splitter baffle
which were conducted in May and June of 2001 indicate that the
specimen was acceptable, Mr. Karabin stated that this fact "does
not mean that the sample takes the place of the contract
documents or was given final approval."  Mr. Karabin also stated:
"If future inspections reveal deficiencies with the fabrication,
the previous inspections do not relieve the contractor from the
responsibility of correcting the problem."  Mr. Karabin enclosed
a copy of Section 52.246-12 of the Federal Acquisition
Regulations which states that government inspections are for the
use of the government and do not constitute or imply acceptance
of the inspected item at that time.  (Exh. 41 to Df's Response to
Pl's CSMF).

Schlosser that the Navy would "not entertain deviations to the contract requirements in order to complete the doors and the overall project within the current projected schedule." (Exh. 9 to Df's Response to Pl's CSMF).

On the same day, February 22, 2002, defendant sent a three-day cure notice to plaintiff pursuant to Article 8 of the subcontract between the parties. In summary, the notice stated that plaintiff's performance on the Oceana project was unsatisfactory; that, specifically, plaintiff's failure to fabricate acceptable splitter baffles continued to delay and was detrimental to the completion of the Oceana project; and that plaintiff's failure to substantially complete the splitter baffles within three calendar days would result in the termination of plaintiff's subcontract with defendant for default. (Pl's App., p. 222).

Mr. Kohn, plaintiff's President, responded to defendant's cure notice on February 25, 2002, stating, *inter alia*, that Lt. Commander Hinton, the Navy's Resident Officer in Charge of Construction, had changed the terms of the contract as implemented by Mr. Turknett over the previous nine months; that plaintiff continued to be willing to perform pursuant to the prior approval of the specimen splitter baffle which had been given by the Navy; that, even if the splitter baffles were refabricated, there was no guarantee they would work or appear any different; and that plaintiff would respond to defendant's

cure notice promptly after the receipt of answers to various
questions that were set forth in the response.  (Pl's App., pp.
223-24).

On February 28, 2002, the following letter was sent to
plaintiff by defendant:

Gentlemen:

Fleming Steel Company has breached the Subcontract
Agreement and pursuant to the cure notice sent to your
office on Friday, February 22, 2002, we are hereby taking
over that portion of work for default in accordance with
Article 8 of the Subcontract Agreement.  Specifically,
Fleming Steel Company's failure to fabricate acceptable
splitter baffles.

As outlined in Article 8, Fleming Steel Company will be
liable for all excess reprocurement costs, including
attorney's fees and consequential damages.  Fleming remains
responsible for all other work in their subcontract.

If you have any questions concerning this directive,
please contact the undersigned at 757-420-5048.

                              Sincerely,
                              W.M. SCHLOSSER COMPANY, INC.

                              s/Rich Karabin
                              Project Manager

(Pl's App., p. 225).

On March 8, 2002, Mr. Karabin sent a letter to Mr. Kohn in
which he stated that defendant would retract the default issued
to plaintiff on February 28, 2002 upon receipt of an executed
purchase order or subcontract with a third party to repair or
reconstruct the splitter baffles for the Oceana project in light
of Mr. Kohn's statement in his February 25th letter that
plaintiff could not guarantee the splitter baffles would work or

appear any different even if they were refabricated by plaintiff. Mr. Karabin also stated that in order for the default to be retracted, defendant would have to receive documentation of the aforementioned purchase order or subcontract no later than March 13, 2002. (Pl's App., p. 226).

On March 11, 2002, Mr. Kohn sent a letter to Mr. Schlosser in which he proposed to repair the burn marks in the nine splitter baffles that had not been refabricated by applying a spray adhesive. Mr. Kohn also stated that plaintiff could not accept a conditional withdrawal of the default issued by defendant because plaintiff had the "right to determine who will repair and/or re-manufacture replacement splitter baffles." In addition, Mr. Kohn stated that plaintiff had stopped working on the splitter baffles on February 5, 2002 at defendant's direction; that plaintiff could not resume work on the splitter baffles until the default was withdrawn by defendant; and that defendant should advise plaintiff as soon as possible about the withdrawal of the default to enable plaintiff to finish the work on the splitter baffles. (Pl's App., pp. 228-29).

On March 13, 2002, Mr. Kohn sent another letter to Mr. Schlosser indicating that the following issues remained unresolved:

\*   \*   \*

1.  The default on the splitter baffles portion of our contract needs to be unconditionally withdrawn.

2.  Fleming is preparing the materials requested by the AROICC regarding the proposed repair to the burn marks in the second nine (unrepaired) splitter baffles.  This will be submitted shortly.

3.  An answer to our numerous requests to schedule a visit by Reggie Turknett to inspect the repaired splitter baffles should be provided.

4.  A definitive answer as to whether or not the demonstrated fit up of the modules is to be performed with or without the splitter baffles needs to be provided.

5.  Lastly, we need a written statement from W.M. Schlosser that any repaired and or newly made splitter baffles will be held to the tolerances established by the approved sample splitter baffle.

                        *    *    *

Mr. Kohn concluded his March 13th letter as follows: "These issues have been unanswered from some time.  The clock is ticking and they need to be resolved quickly.  We have been standing by since February 5th (when we were directed by W.M. Schlosser to stop work on the baffles) to resolve these issue (sic) and proceed.  Please give these matters your personal attention and let's move on with this project."[27]  (Pl's App., pp. 230-31).

---

[27]On March 15, 2002, Mr. Rapp, plaintiff's Vice President of Operations, submitted a report to Mr. Jones, defendant's Quality Control Manager, detailing the number and location of the burns in the fabric cloth of the splitter baffles, together with a data sheet from the manufacturer of the glue which plaintiff proposed to apply to resolve the burn issue and a sample of the glue itself.  With respect to the number of burns in the splitter baffles, Mr. Rapp's report indicates the following:

          Baffle 6A-1          11 burns
          Baffle 6A-2           3 burns
          Baffle 6A-3           5 burns
          Baffle 6A-4           6 burns
          Baffle 6A-5           1 burn

On March 19, 2002, Mr. Kohn sent the following letter to

defendant:

Gentlemen:

Based upon our telephone conference on March 14, 2002, we
were expecting last Friday to receive the letter withdrawing
the notice of default.  Unfortunately it has still not been
received.

It was also conveyed that (sic) Navy indicated that they
would have a date set for Reggie Turknett's visit prior to
the end of the week.  As of today, will (sic) still have no
word on when that will occur.

Last Friday, we forwarded all of the materials requested by
the AROICC for review on the proposed repair to the burn
marks.

Please advise us on these outstanding matters as soon as
possible as they have a direct bearing on the completion
date.

If you should have any questions, please do not hesitate to
contact us.

                    Yours very truly,
                    FLEMING STEEL COMPANY

                    s/Seth Kohn
                    President

---

| Baffle 6A-6  | 7 burns  |
| Baffle 6A-7  | 2 burns  |
| Baffle 6A-8  | 9 burns  |
| Baffle 6A-9  | 5 burns  |
| Baffle 6A-10 | 6 burns  |
| Baffle 6A-11 | 29 burns |
| Baffle 6A-12 | 1 burn   |
| Baffle 6A-13 | 12 burns |
| Baffle 6A-14 | 6 burns  |
| Baffle 6A-15 | 10 burns |
| Baffle 6A-16 | 1 burn   |
| Baffle 6A-17 | 3 burns  |
| Baffle 6A-18 | 11 burns |

(Pl's App., pp. 232-33).

(Pl's App., p. 234).

On the same day, March 19, 2002, Mr. Karabin, defendant's Project Manager, notified Mr. Kohn that "the letter of default for the lack of performance with regards to the splitter baffle fabrication is being withdrawn." (Exh. 21 to Df's Response to Pl's CSMF).[28]

On March 22, 2002, the Navy sent a 10-day cure notice to defendant in which the Navy threatened to terminate defendant's prime contract "due to a number of quality issues specifically identified with the splitter baffles." (Exh. 42 to Df's Response to Pl's CSMF). In turn, on March 25, 2002, defendant sent another three-day cure notice to plaintiff pursuant to Article 8 of the parties' subcontract, reiterating its position that plaintiff's performance on the subcontract, i.e., plaintiff's

---

[28]Two days later, on March 21, 2002, Mr. Rapp, plaintiff's Vice President of Operations, sent a facsimile to defendant to which a report was attached that showed the number and size of the fabric burns in the splitter baffles. With respect to the number of burns in the splitter baffles which had not been re-fabricated by plaintiff, the report forwarded by Mr. Rapp indicated the following:

| | |
|---|---|
| Baffle 6A-1 | 16 burns |
| Baffle 6A-4 | 7 burns |
| Baffle 6A-5 | 2 burns |
| Baffle 6A-9 | 7 burns |
| Baffle 6A-10 | 6 burns |
| Baffle 6A-11 | 33 burns |
| Baffle 6A-12 | 1 burn |
| Baffle 6A-13 | 10 burns |
| Baffle 6A-18 | 13 burns |

(Exh. 13 to Df's Response to Pl's CSMF).

failure to fabricate acceptable splitter baffles, was
unsatisfactory. (Pl's App., p. 236).

On March 27, 2002, plaintiff sent a facsimile to Morgan
Fabrication, Inc. to which was attached a purchase order for the
fabrication of nine splitter baffles for the acoustical intake
sliding doors for the Oceana project at a cost of $3,500.00 each.
The facsimile indicated that the original purchase order, the
drawings and a copy of the specifications for the acoustical
intake sliding doors were being sent under separate cover.[29]
(Pl's App., pp. 237-38).

On March 29, 2002, defendant terminated its entire
subcontract with plaintiff due to plaintiff's "failure to
fabricate acceptable splitter baffles and complete the Intake
door in compliance with the Contract." (Pl's App., p. 239).
Thereafter, on April 4, 2002, defendant entered into an agreement

---

[29]On March 27, 2002, a copy of the purchase order issued to
Morgan Fabrication, Inc. by plaintiff was telefaxed to
defendant's President, Mr. Schlosser, by Mr. Karabin, defendant's
Project Manager, from defendant's office in southern Virginia.
The cover to the facsimile stated:

> "This purchase order was faxed to this office this
> afternoon. It only indicates that Fleming is building nine
> baffles instead of the full eighteen. In addition, there
> might be a few other issues with door parts that Fleming has
> failed to address. This info is via a phone conversation
> with Bill Jones after he left the factory to head back to
> the airport. I will have a full report from him by mid-
> morning. There is more information that Seth has to provide
> before he satisfies all the requirements of the cure notice.
> I will keep you informed."

(Exh. 4 to Df's Response to Pl's CSMF).

with Morgan Fabrication, Inc. (the same company to which
plaintiff had issued a purchase order on March 29, 2002) for the
fabrication of 18 splitter baffles for the acoustical intake
sliding doors for the Oceana project in the total amount of
$63,000.00.[30] (Pl's App., p. 240).

---

[30]Plaintiff claims that the heat required to weld the
perforated stainless steel sheets to the frames of the splitter
baffles for the Oceana project exceeded the burning point of the
fiberglass cloth required by the contract specifications, and
that, as a result, heat transference would sometimes cause a
discoloration or burn mark on the fiberglass cloth at the
location of the weld because, under the specifications, the
fiberglass cloth "had to be pressing against the top perforated
stainless steel sheet when that sheet was welded to the stainless
steel frame." (Pl's Brief in Supp., pp. 4-5). Defendant
disputes this claim based, *inter alia*, on the deposition of Mr.
Turknett during which he testified that the splitter baffles
fabricated by Morgan Fabrication, Inc. did not contain burn
marks. According to Mr. Turknett, the welding performed by
Morgan Fabrication, Inc. on the splitter baffles was "absolutely
beautiful." (Exh. 14 to Df's Response to Pl's CSMF, p. 46).