IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FLEMING STEEL COMPANY,                  )
                                        )
              Plaintiff,                )
                                        )
         vs.                            ) Civil Action No. 02-828
                                        )
W.M. SCHLOSSER COMPANY, INC.,           )
                                        )
              Defendant.                )

MEMORANDUM

I

In this diversity action, Plaintiff, Fleming Steel Company,
and Defendant, W.M. Schlosser Company, Inc., assert breach of
contract claims against each other arising out of a construction
project for the United States Navy ("the Navy"). Presently
before the Court is Defendant's renewed motion for partial
summary judgment, and motion for summary judgment as to
liability, pursuant to Fed.R.Civ.P. 56. For the reasons set
forth below, the motions will be granted.

II

For purposes of the present motions, the following facts are
undisputed:[1]

1. On December 29, 1999, the Navy issued a solicitation for
bids to construct an aircraft acoustical enclosure at the Oceana

_____

[1]The undisputed facts have been drawn from the Court's
August 19, 2005 Memorandum Opinion which denied the parties'
earlier cross-motions for summary judgment and the facts in
Defendant's Statement of Material Facts Not in Dispute which
Plaintiff has admitted. (Doc. 63, Doc. 87 and Doc. 90).

Naval Air Station in Virginia Beach, Virginia ("the Oceana project").[2] Defendant submitted a bid in response to the solicitation and, on February 17, 2000, Defendant was awarded the Prime Contract for the Oceana project.[3] (Doc. 63, p. 2, Doc. 87, ¶ 1, Doc. 90, ¶ 1).

2. On June 12, 2000, Defendant entered into an agreement with Plaintiff for the construction of the acoustical intake sliding doors for the Oceana project (the "Subcontract").[4] (Doc. 87, ¶ 2, Doc. 90, ¶ 2). With respect to breaches, Article 8 of the Subcontract provides in relevant part:

\*   \*   \*

8.   The following shall be deemed a breach of this
     agreement: Failure to fulfill any obligation of this
     Subcontract or of the Prime Contract concerning
     Subcontractor's work or responsibilities; ... Failure
     to maintain Contractor's progress schedule in effect at
     that time; ... If Subcontractor breaches this
     Subcontract, Contractor may terminate Subcontractor's
     right to proceed upon three (3) calendar days' written
     cure notice. Contractor may then have all or a portion
     of Subcontractor's work completed and may use
     Subcontractor's materials, supplies, tools and
     equipment to complete ... Subcontractor (and its

---

[2]The Navy utilizes aircraft acoustical enclosures, which are built to be as soundproof as possible, for engine-in-aircraft high power testing to minimize the disturbance that such testing causes to neighbors. (Doc. 63, p. 1).

[3]The scheduled completion date for the Oceana project was October 17, 2001. (Doc. 63, p. 2).

[4]The Subcontract contains a choice of law provision which requires the resolution of all disputes in accordance with the laws of the Commonwealth of Virginia. (Doc. 87, Exh. 2, Tab C, Article 11).

> surety) shall continue to be liable for all costs to
> complete and any damages and expenses including
> reasonable counsel fees, liquidated damages assessed by
> Owner and other liabilities which may result from the
> default or breach, without waiver of any other rights
> or remedies available to Contractor, ...  If it is
> determined that Contractor wrongfully terminated this
> Subcontract under this Article, that action shall be
> treated as a termination for the Contractor's
> convenience and Subcontractor shall be entitled to the
> compensation set forth in Article 29 of this
> Agreement.[5]

\*   \*   \*

(Doc. 63, pp. 3-4).

3.   Article 15 of the Subcontract incorporates the Prime

Contract between Defendant and the Navy by reference, and the

Prime Contract incorporates sections of the Federal Acquisition

Regulation ("FAR"), including Section 52.236-21 (relating to

Specifications and Drawings for Construction) and Section 52.246-

12 (relating to Inspection of Construction).   (Doc. 63, p. 3,

---

[5]Article 29 of the Subcontract provides in pertinent part:

\*   \*   \*

29.   Contractor shall have the right to terminate this
      agreement for its own convenience for any reason by
      giving notice of termination....   [I]f the termination
      is initiated by the Contractor, the Subcontractor shall
      be paid only the actual cost for work and labor in
      place, plus five percent (5%) overhead and profit, or a
      prorated percentage of completion, whichever is
      less....

\*   \*   \*

(Doc. 63, p. 4, n.4).

3

n.3, Doc. 87, ¶ 3, Exh. 9, pp. 9-10, Doc. 90, ¶ 3).  Under the

Subcontract, Plaintiff's work was to be performed in "strict

accordance" with the specifications.  (Doc. 87, ¶ 4, Doc. 90,

¶ 4).

   4.   Plaintiff's work under the Subcontract included the

construction of 18 splitter baffles for the acoustical intake

sliding doors.  (Doc. 87, ¶ 5, Doc. 90, ¶ 5).  To construct a

splitter baffle, a perforated stainless steel sheet is welded

onto one side of a stainless steel channel frame.  Insulation,

which has been wrapped in fiberglass cloth,[6] is then inserted

into the frame and another perforated stainless steel sheet is

welded onto the other side of the frame.[7]  (Doc. 63, pp. 4-5).

_____

[6]The specifications concerning the fiberglass cloth to be
used in the splitter baffles for the Oceana project, which are
set forth in Section 2.1.5.d of Specification 13300, provide:

               *    *    *

   d.   Glass Fiber Cloth: Provide fiberglass cloth with the
        following properties: count - 34x22; warp - 75/1/0;
        filling - 75/1/0; weight - 5.45 ounces per square yard;
        thickness - 0.0065-inches; tensile strength - 225x195
        pounds per inch, greige, and shall be style No. 7626
        plain weave fiberglass....  Notwithstanding any other
        requirement of this contract, no other product will be
        accepted.

               *    *    *

(Doc. 63, p. 5, n.6).

   [7]Other components of the acoustical intake sliding doors for
the Oceana project included acoustical panels and acoustical
turning vanes.  The construction of these components was similar
to the construction of the splitter baffles.  (Doc. 63, pp. 4-5).

                          4

5.  Specification 13300, which is incorporated into the

Subcontract, provides in relevant part:

SECTION 13300

ACOUSTICAL INTAKE SLIDING DOORS

\*   \*   \*

1.4.2.1  Specimen Acoustical Panel and Baffle

Prior to fabrication of acoustical panels and baffles to be
used in the acoustical intake sliding doors, the
manufacturer shall fabricate a full size specimen of a
typical acoustical panel and baffle which shall be approved
by the Contracting Officer and which shall serve as the
reference for establishing the acceptability of all
fabricated acoustical panels and baffles.  The specimen
acoustical panel and baffle shall conform to all of the
requirements of the contract including quality control,
testing, form, fit, size and function and shall meet all of
the requirements of the contract documents.  Fabrication and
all contract document requirements must be satisfied and
complete prior to submission of specimens for approval.  All
acoustical panels and baffles shall be continuously
inspected during fabrication to assure that the packed
insulation exerts a uniform outward pressure on the face
sheets and that there are no visible voids or wrinkles in
the fiberglass cloth facing.

\*   \*   \*

3.3.2.1  Acoustical Panels, Splitter Baffles and Acoustical
Turning Vanes

Fabricate as indicated and as specified herein:

a.   Acoustical material for installation in wall panels,
     splitter baffles and turning vanes shall fill the void
     space to the full density indicated.  Acoustical
     material within the perforated sheet facing shall be so
     fabricated as to be compressed and exert pressure on
     the sheets and packing to prevent flutter due to air
     pressure and velocity.  The sheets, or combination of
     sheets, shall be formed and fastened to provide a rigid
     integral panel.  The cloth fabric shall be placed
     around the acoustical insulation with extreme care to

5

prevent tears or wrinkles. A specimen acoustical panel
and splitter baffle shall be fabricated and approved by
the Contracting Contracting (sic) Officer prior to
fabrication of the panels and splitter baffles to be
used in the door. The approved panel and splitter
baffle shall serve as the reference for establishing
the acceptability of all fabricated panels. All
acoustical panels, splitter baffles, and acoustical
turning vanes shall be continuously inspected during
fabrication to assure that the packed insulation exerts
a uniform outward pressure on the face sheets and that
there are no visible voids or wrinkles in the
fiberglass cloth facing.

\*    \*    \*

(Doc. 63, pp. 6-7).

6.   Plaintiff fabricated a specimen splitter baffle, and, on

May 31, 2001, Reginald E. Turknett, a representative of the

Navy's Contracting Officer, conducted a site visit to Plaintiff's

manufacturing facility for the purpose of approving the specimen

splitter baffle pursuant to Sections 1.4.2.1 and 3.3.2.1.a of

Specification 13300. Although he noted various discrepancies

from the specifications which required correction, Mr. Turknett

found the specimen splitter baffle to be acceptable. By letter

dated June 4, 2001, Wirt Shinault, the Navy's Resident Engineer

in Charge of Construction, notified Defendant that the specimen

splitter baffle fabricated by Plaintiff had been inspected on May

31, 2001 and was found to be acceptable. (Doc. 63, p. 8).

7.   On June 13, 2001, Mr. Turknett conducted another site

visit to Plaintiff's manufacturing facility to inspect the

specimen acoustical panel fabricated by Plaintiff and to re-

6

inspect the specimen splitter baffle following installation of
the leading and trailing edges.  In his report regarding this
site visit, Mr. Turknett noted one discrepancy in the specimen
splitter baffle that required correction.  By letter dated June
15, 2001, Mr. Shinault notified Defendant that the specimen
acoustical panel had been inspected on June 13, 2001 and was
found to be acceptable.  Mr. Shinault's June 15th letter does not
mention the specimen splitter baffle which had been re-inspected
by Mr. Turknett.  (Doc. 63, p. 9).

     8.   Another site visit to Plaintiff's manufacturing facility
was conducted by a representative of the Navy's Contracting
Officer on August 28, 2001.  On August 30, 2001, Mr. Shinault
sent a letter to Defendant regarding this site visit, expressing
concern that "... Quality Control is not providing the same
Quality that went into manufacturing the samples that were
inspected on May 31, 2001 and June 13, 2001."  The following item
was among the items that Mr. Shinault indicated needed immediate
attention:

                    *    *    *

2.   Splitter Baffle Piece No. 6-A-1: a) Insulation Fabric
     burned through needs to be replaced, b) Check all
     fabricated pieces for burn through and replace, c)
     Numerous spots of buckling were measured in the
     perforated sheet some at 7/8" [-] correct as necessary
     to meet specifications, d) Clean welds in corners of
     panels, e) edge clearance on fit up incorrect, and
     crown in panel measured at 3/8" [-] these items need to
     be corrected, f) Leading edges do not fit up with panel

                           7

correctly, g) check tolerances with specifications on all of above items.

\*   \*   \*

(Doc. 63, pp. 9-10).[8]

9.   The concerns raised in Mr. Shinault's August 30th letter were communicated to Plaintiff, and, by letter to Defendant dated September 6, 2001, Plaintiff's President, Seth Kohn, responded to those concerns.  With regard to the Navy's complaints about splitter baffle No. 6-A-1, Mr. Kohn stated:[9]

\*   \*   \*

2.   SPLITTER BAFFLE PIECE NO. 6A-1

A.   The trim piece and perforated sheet will be removed, the fabric cloth will be replaced with new cloth and the perforated sheet and trim piece will be re-installed and weld tested.  To further protect the fabric from being burned, we will continue to place a stainless steel plate over the perforated sheet to protect the fabric.

---

[8]In his August 30th letter, Mr. Shinault noted the potential impact of these quality control issues on the scheduled completion date, reminding Defendant that the completion date for the Oceana project was October 17, 2001 and that liquidated damages under the Prime Contract were $4,583 for each day of delay.   (Doc. 63, p. 10 and p. 10, n.12).

[9]In his September 6th letter, Mr. Kohn initially took exception to Mr. Shinault's comment about the alleged decline in Plaintiff's quality control.  According to Mr. Kohn, the August 28th site visit was not a scheduled formal inspection.   Rather, it was an interim visit to determine the progress of Plaintiff's work.  As a result, Mr. Kohn maintained that none of the materials which were examined and mentioned in Mr. Shinault's August 30th letter were complete and ready for an official inspection.   (Doc. 63, p. 11, n.13).

8

   B.   The balance of baffles will be inspected for this
        condition.

   C.   To meet the specification requirements, we will
        loosen and re-attach the perforated sheets to
        correct the buckling condition.  This work will be
        done in accordance with the proper procedures.

   D.   Cleaning was not complete at the time the baffle
        was viewed.  The corners will be cleaned at the
        proper time.

   E.   During operations stated in A & C, this clearance
        problem will be corrected.

   F.   The leading edge will be removed, trimmed to the
        low end of +/- 1/8" to match the baffle
        dimensions.

   G.   Quality Control will conduct inspections at the
        appropriate times.

                        *    *    *

(Doc. 63, pp. 11-12).

     10.  On October 31, 2001, Tom Rapp, Plaintiff's Vice

President of Operations, wrote a letter to William Jones,

Defendant's Quality Control Manager, concerning the burn holes in

the fabric cloth in the splitter baffles fabricated by Plaintiff.

In his letter, Mr. Rapp noted that Plaintiff had made inquiries

into materials which would be suitable to patch the holes, and he

enclosed samples of several patching materials.  Mr. Rapp

concluded his letter by requesting notification "as to whether

any of these products would be acceptable."  Mr. Jones responded

on November 5, 2001, stating that authorization to patch the burn

holes was denied and requesting continuation "with initial

                              9

direction to replace the fabric cloth for the affected areas."
Subsequently, Plaintiff refabricated nine of the 18 splitter
baffles to replace the fabric cloth which contained burn holes.
(Doc. 63, p. 13).

    11.  On February 15, 2002, representatives of the Navy,
together with representatives of Defendant, visited Plaintiff's
manufacturing facility for the purpose of inspecting the nine
splitter baffles that had been refabricated to repair the burn
holes in the fiberglass cloth surrounding the insulation.  Mr.
Jones, Defendant's Quality Control Manager and one of its
representatives during the February 15th site visit, prepared a
report following the site visit in which he rendered the
following conclusion:

                        *   *   *

Conclusion

    In general, all 9 of the inspected Splitter Baffles that
    have been reworked to (sic) due burned fabric underneath the
    perforated stainless steel sheeting, display various amounts
    of bulges and deflections in the horizontal flatness areas,
    display irregular or "out of shape" radius pieces for the
    leading and trailing edges, are dimensionally smaller than
    specified, and the leading and trailing edges, for the most
    part, are no longer lapped onto the margins of the
    perforated sheeting which has exposed the "C" channel
    underneath it.

    Furthermore, I have concluded that these 9 Splitter Baffles
    are not within the tolerances specified by the contract
    drawings, contract specifications, or approved Splitter
    Baffle sample and shall not be utilized for installation.

                        *   *   *

10

(Doc. 63, p. 14).¹⁰

12.  On February 20 and February 21, 2002, Mr. Jones

returned to Plaintiff's manufacturing facility to inspect the

nine splitter baffles that had not been refabricated by

Plaintiff, including the specimen splitter baffle.  Mr. Jones

began his report concerning this inspection as follows:

> The purpose of this visit to Fleming Steel's shop was to
> conduct a detailed inspection of the Splitter Baffles that
> reflect "burned" or "charred" areas of fiberglass cloth
> underneath the stainless steel perforated sheet, to
> determine whether or not the areas of concern actually
> contain holes in the fabric cloth.

                    *    *    *

Mr. Jones then described his findings as to each of the nine

splitter baffles, and set forth his conclusion as follows:

> Conclusion:
>
> Dimensionally, (including horizontal flatness), the 9
> inspected Splitter Baffles are as good and in some cases
> better, than the dimensions reflected in the approved sample
> panel, piece 6a-13.
>
> However, due to the defective material within the Splitter
> Baffles, the above-mentioned 9 baffles are unacceptable and
> shall not be utilized for installation.

_____

¹⁰On February 15, 2002, the date of the inspection of the
nine refabricated splitter baffles at Plaintiff's manufacturing
facility, Mr. Shinault, the Navy's Resident Engineer in Charge of
Construction, sent a letter to Rich Karabin, Defendant's Project
Manager, concerning the items which were observed during the
inspection that needed immediate attention.  These items included
the edges on the splitter baffles ("Improper fit up of edges on
splitter baffles") and the perforated sheets on the splitter
baffles ("Deformed perforated sheets out of tolerance on splitter
baffles").  (Doc. 63, pp. 14-15).

11

**This concludes that all 18 fabricated Splitter Baffles have not been fabricated within the tolerances and guidelines set forth in the Contract Drawings and/or Contract Specifications and are unacceptable.**

(Doc. 63, pp. 15-16).[11]

13. On February 21, 2002, Mr. Rapp, Plaintiff's Vice President of Operations, sent the following fax to Mr. Karabin, Defendant's Project Manager, regarding the Navy's approval of the specimen splitter baffle and subsequent rejection of all 18 splitter baffles fabricated by Plaintiff:

Dear Rich,

Attached are copies of two (2) faxes relative to the referenced specimen approval.

The first report indicates that the baffle is approved. At the time of the first approval inspection, the leading and trailing edge trim was not attached.

The second report deals mainly with the approval of the Specimen Acoustical Panel, however, page 2 reports that the Specimen Acoustical Baffle was reviewed with the leading and trailing edge trim attached and approved with only one discrepancy noted. Nothing was said or reported concerning burns in the fiberglass cloth. No work has been done on the Specimen Acoustical Baffle since the date of its approval (June 15, 2001). How does it happen that a specimen can be approved by both [Mr. Turknett] and [Mr. Shinault] in June of 2001, and the same piece be rejected in February of 2002?

_____

[11]According to his report, Mr. Jones' inspection of the nine splitter baffles that had not been refabricated by Plaintiff on February 20 and February 21, 2002 revealed the following number of burn holes: Splitter Baffle 1.6a-13 (sample) - 10; Splitter Baffle 2.6a-18 - 13; Splitter Baffle 3.6a-12 - 1; Splitter Baffle 4.6a-4 - 7; Splitter Baffle 5.6a-11 - 32; Splitter Baffle 6.6a-5 - 2; Splitter Baffle 7.6a-9 - 5; Splitter Baffle 8.6a-10 - 6; and Splitter Baffle 9.6a-1 - 13. (Doc. 63, pp. 15-16, n.15).

The nine baffles re-inspected yesterday are all within the
same tolerance of the approved specimen.  The cloth is in
the same relative condition on all nine of those baffles as
well.  The first nine baffles that were repaired and are now
out of specified tolerance were within tolerance prior to
replacing the cloth and re-welding.  The cloth that was
replaced was in the same condition as that of the approved
specimen baffle.

Sincerely,
s/Tom Rapp

(Doc. 63, pp. 16-17).

14.   Mr. Karabin responded to Mr. Rapp's fax on the same
day.  While noting that the Navy's letters regarding the two
inspections of the specimen splitter baffle which were conducted
in May and June of 2001 indicate that the specimen was
acceptable, Mr. Karabin stated that this fact "does not mean that
the sample takes the place of the contract documents or was given
final approval."  Mr. Karabin also stated: "If future inspections
reveal deficiencies with the fabrication, the previous
inspections do not relieve the contractor from the responsibility
of correcting the problem."  Mr. Karabin enclosed a copy of
Section 52.246-12 of the FAR which states that government
inspections are for the sole benefit of the government and do not
constitute or imply acceptance of the inspected item at that
time.   (Doc. 63, p. 17, n.16).

15.   On February 22, 2002, Defendant sent a three-day cure
notice to Plaintiff pursuant to Article 8 of the Subcontract.  In
summary, the notice stated that Plaintiff's performance on the

13

Oceana project was unsatisfactory; that, specifically,
Plaintiff's failure to fabricate acceptable splitter baffles
continued to delay and was detrimental to the completion of the
Oceana project; and that Plaintiff's failure to substantially
complete the splitter baffles within three calendar days would
result in the termination of the Subcontract for default.[12]
(Doc. 63, pp. 18-19).

16.  On February 25, 2002, Mr. Kohn, Plaintiff's President,
responded to Defendant's cure notice, stating that the Navy's
Resident Officer in Charge of Construction had changed the terms
of the parties' agreement as implemented by Mr. Turknett, a
representative of the Navy's Contracting Officer, over the
previous nine months; that Plaintiff continued to be willing to
perform pursuant to the prior approval of the specimen splitter
baffle which had been given by the Navy; that, even if the
splitter baffles were refabricated, there was no guarantee they
would work or appear any different; and that Plaintiff would
respond to Defendant's cure notice promptly after the receipt of

_____

[12]On February 22, 2002, the same day that Defendant sent the
three-day cure notice to Plaintiff, Lt. Commander S. Hinton,
P.E., the Navy's Resident Officer in Charge of Construction, sent
a letter to Defendant regarding his February 15, 2002 visit to
Plaintiff's manufacturing facility, expressing concern about the
quality of the components for the acoustical intake sliding doors
and informing Defendant that the Navy would "not entertain
deviations to the contract requirements in order to complete the
doors and the overall project within the current project
schedule."  (Doc. 63, p. 18).

14

answers to the questions set forth in the response.  (Doc. 63, p. 19).

17.  Three days later, on February 28, 2002, Mr. Karabin, Defendant's Project Manager, sent a letter to Plaintiff declaring Plaintiff in breach of the Subcontract for failing to fabricate acceptable splitter baffles and indicating that Defendant would take over that portion of the Subcontract.  (Doc. 63, pp. 19-20). Subsequently, on March 8, 2002, Mr. Karabin sent a letter to Mr. Kohn, Plaintiff's President, in which he stated that Defendant would retract the default issued on February 28th upon receipt of an executed purchase order or subcontract with a third party to repair or reconstruct the splitter baffles in light of Mr. Kohn's statement in his February 25th letter that Plaintiff could not guarantee the splitter baffles would work or appear any different even if they were refabricated by Plaintiff.  (Doc. 63, p. 20).

18.  On March 11, 2002, Mr. Kohn sent a letter to Andrew Schlosser, Defendant's President, proposing to repair the burns in the nine splitter baffles which had not been refabricated by applying a spray adhesive.[13]  Mr. Kohn also stated that Plaintiff

_____

[13]On March 15, 2002, Mr. Rapp, Plaintiff's Vice President of Operations, submitted a report to Mr. Jones, Defendant's Quality Control Manager, detailing the number and location of the burns in the fabric cloth of the splitter baffles, together with a data sheet from the manufacturer of the adhesive which Plaintiff proposed to apply to resolve the burn issue and a sample of the adhesive.  With respect to the number of burns in the splitter baffles, Mr. Rapp's report indicates the following: Baffle 6A-1 - 11 burns; Baffle 6A-2 - 3 burns; Baffle 6A-3 - 5 burns; Baffle

15

could not accept a conditional withdrawal of the default issued by Defendant because Plaintiff had the "right to determine who will repair and/or re-manufacture replacement splitter baffles," and that Plaintiff could not resume work on the splitter baffles, which had ceased on February 5, 2002 at Defendant's direction, until the default was withdrawn by Defendant. (Doc. 63, pp. 20-21).

19.   A conference among representatives of the parties was held on March 14, 2002, and, on March 19, 2002, Mr. Karabin, Defendant's Project Manager, notified Mr. Kohn that "the letter of default for the lack of performance with regards to the splitter baffle fabrication is being withdrawn." (Doc. 63, p. 23).

20.   On March 22, 2002, the Navy sent a 10-day cure notice to Defendant in which the Navy threatened to terminate the Prime Contract with Defendant "due to a number of quality issues specifically identified with the splitter baffles." Three days later, on March 25, 2002, Defendant sent another three-day cure notice to Plaintiff pursuant to Article 8 of the Subcontract, reiterating its position that Plaintiff's performance on the

---

6A-4 - 6 burns; Baffle 6A-5 - 1 burn; Baffle 6A-6 - 7 burns; Baffle 6A-7 - 2 burns; Baffle 6A-8 - 9 burns; Baffle 6A-9 - 5 burns; Baffle 6A-10 - 6 burns; Baffle 6A-11 - 29 burns; Baffle 6A-12 - 1 burn; Baffle 6A-13 - 12 burns; Baffle 6A-14 - 6 burns; Baffle 6A-15 - 10 burns; Baffle 6A-16 - 1 burn; Baffle 6A-17 - 3 burns; and Baffle 6A-18 - 11 burns.   (Doc. 63, p. 22, n.17).

16

Subcontract (i.e., Plaintiff's failure to fabricate acceptable

splitter baffles) was unsatisfactory. (Doc. 63, p. 24).

21. On March 29, 2002, Defendant terminated the entire

Subcontract with Plaintiff due to Plaintiff's "failure to

fabricate acceptable splitter baffles and complete the intake

door in compliance with the contract." Thereafter, on April 4,

2002, Defendant entered into an agreement with Morgan

Fabrication, Inc. for the fabrication of 18 splitter baffles for

the acoustical intake sliding doors for the Oceana project at a

cost of $63,000.[14]

III

Under Rule 56(c) of the Federal Rules of Civil Procedure,

summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with

---

[14]With respect to the burn marks and holes in the fiberglass
cloth in the splitter baffles, Plaintiff claims that the heat
required to weld the perforated stainless steel sheets to the
frames of the splitter baffles exceeded the burning point of the
fiberglass cloth required by the contract specifications. As a
result, according to Plaintiff, heat transference would sometimes
cause a discoloration or burn mark on the fiberglass cloth at the
location of the weld because, under the specifications, the
fiberglass cloth "had to be pressing against the top perforated
stainless steel sheet when that sheet was welded to the stainless
steel frame." Defendant disputes this claim based on, among
other things, the deposition of Mr. Turknett, the representative
of the Navy's Contracting Officer who conducted the May and June
2001 site visits to Plaintiff's manufacturing facility.
Specifically, during his deposition, Mr. Turknett testified that
the splitter baffles manufactured by Morgan Fabrication, Inc. did
not contain burn marks. In fact, according to Mr. Turknett, the
welding performed by Morgan Fabrication, Inc. on the splitter
baffles was "absolutely beautiful." (Doc. 63, pp. 25-26, n.20).

17

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-324. Once the moving party has met its burden, Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

18

IV

Renewed Motion for Partial Summary Judgment

A

With respect to the renewal of Defendant's motion for
partial summary judgment, the relevant history of this case may
be summarized as follows:

After the parties' pretrial statements had been filed,
Defendant filed a motion for partial summary judgment seeking a
ruling "that, as a matter of law, the inspection and approval of
the sample baffle constructed by Plaintiff in this case, did not
relieve Plaintiff of the obligation to comply strictly with the
contract plans and specifications in the fabrication of
subsequent baffles."[15]  (Doc. 45).  In the brief filed in

_____

[15]Based on the narrative statement in Plaintiff's pretrial
statement (Doc. 38), Defendant characterized Plaintiff's claim in
this case as follows:

                    *    *    *
        .

    As is evident from its Pretrial Statement, the crux of
    Fleming's position in this case is that (1) the Navy
    inspectors approved, in May and June 2001, a "sample" baffle
    that Fleming had constructed; (2) the sample was out of
    contractually specified tolerance and had burn marks or
    holes in the fiberglass insulating material within the
    baffle; and therefore (3) the Navy was legally required to
    accept subsequently made baffles with those characteristics,
    even if those characteristics were not in accordance with
    the applicable specifications.  See Fleming Pretrial
    Statement, at pp. 3-8.  In essence, Fleming contends that
    approval of a sample baffle by the Navy acts as a waiver of
    all conflicting contractual requirements.

                    *    *    *

19

opposition to Defendant's motion for partial summary judgment,
Plaintiff asserted that the motion was "based on a mistaken view
of Fleming Steel's claim," specifically denying that it was
claiming that the Navy's approval of the sample splitter baffle
resulted in a waiver of the contract specifications with respect
to the fabrication of subsequent splitter baffles. (Doc. 52, p.
5). In light of the foregoing assertion by Plaintiff, the Court
denied Defendant's motion for partial summary judgment as moot in
a Memorandum Opinion dated August 19, 2005.[16] (Doc. 63, pp. 35-
36).

Subsequently, on November 3, 2005, during a telephone
conference among the Court and counsel for the parties,
Plaintiff's counsel stated that while Plaintiff was not claiming
that the Navy's approval of the sample splitter baffle relieved
Plaintiff of complying with the contract specifications in
connection with the fabrication of subsequent splitter baffles,
Plaintiff was claiming that approval of the sample splitter
baffle set the standard for acceptability of the remaining
splitter baffles to be fabricated under the Subcontract.
Therefore, according to Plaintiff, because the subsequent

(Doc. 46, p. 2).

[16]In the August 19, 2005 Memorandum Opinion, the Court also
denied Plaintiff's motion for summary judgment on Defendant's
liability for wrongful termination of the Subcontract. (Doc. 63,
pp. 28-34). This determination is the basis of Defendant's
present motion for summary judgment as to liability. (Doc. 84).

20

splitter baffles were as good as, or better than, the approved sample splitter baffle, Defendant's termination of the Subcontract for default was wrongful, entitling Plaintiff to damages under Article 29 of the Subcontract.

Following the clarification of Plaintiff's position regarding the effect of the Navy's approval of the sample splitter baffle on the fabrication of subsequent splitter baffles during the November 3ʳᵈ telephone conference, Defendant filed a motion in limine based on the doctrine of judicial estoppel. Specifically, in light of Plaintiff's denial in opposition to Defendant's motion for partial summary judgment that it was claiming that the Navy's approval of the sample splitter baffle resulted in a waiver of the contract specifications with regard to the fabrication of subsequent splitter baffles (which resulted in the denial of Defendant's motion for partial summary judgment as moot), Defendant sought a ruling precluding Plaintiff from arguing that fabrication of splitter baffles in accordance with the sample splitter baffle satisfied Plaintiff's obligations under the Subcontract, despite the fact that all of the splitter baffles contained burn marks and holes in the fiberglass cloth surrounding the insulation and the fact that the nine refabricated splitter baffles were not within the tolerances set forth in the contract specifications.   (Doc. 66).

21

On March 30, 2006, the Court denied Defendant's motion in limine, declining to apply the doctrine of judicial estoppel because it could not conclude that Plaintiff was "playing fast and loose" with the Court as asserted by Defendant. However, in light of the clarification of Plaintiff's position during the November 3rd conference regarding the effect of the Navy's approval of the sample splitter baffle on the fabrication of subsequent splitter baffles (i.e., the Navy's approval of the sample splitter baffle did not result in a waiver of the contract specifications with respect to subsequent splitter baffles, rather the approval set the "standard" for acceptability of subsequent splitter baffles), the Court concluded that Defendant should be given the opportunity to renew its motion for partial summary judgment. (Doc. 82 and Doc. 83).

B

In its renewed motion for partial summary judgment, Defendant again seeks judgment as a matter of law on the following issue: Whether the Navy's inspection and approval of the sample splitter baffle relieved Plaintiff of its obligation to comply strictly with the contract specifications in the fabrication of subsequent baffles. (Doc. 86).

Defendant's argument in support of its renewed motion for partial summary judgment is threefold. First, defendant contends that, under certain provisions of the FAR which are incorporated

22

into the parties' Subcontract, the Navy's approval of the sample
splitter baffle did not relieve Plaintiff of its obligation to
comply strictly with the contract specifications with regard to
the fabrication of the remaining splitter baffles.  Second,
defendant contends that the FAR supercedes any conflicting
contractual provisions.  Third, Defendant contends that
Plaintiff's proffered interpretation of the parties' Subcontract
is unreasonable and illogical.

i

Turning to Defendant's first argument, the Court initially
notes that because provisions of the FAR are incorporated into
the Prime Contract between Defendant and the Navy, those
provisions applicable to the work to be performed by Plaintiff on
the Oceana project are incorporated into the parties' Subcontract
pursuant to Article 15, which provides:[17]

\*    \*    \*

---

[17]The purpose of the FAR system is to codify and publish
uniform policies and procedures for acquisition by all executive
agencies, including military departments such as the Navy.  See
48 C.F.R. §§ 1.01 and 2.101.  The FAR system is developed in
accordance with the requirements of the Office of Federal
Procurement Policy Act of 1974, and the FAR is prepared, issued
and maintained, and the FAR system is prescribed, jointly by the
Secretary of Defense, the Administrator of General Services and
the Administrator, National Aeronautics and Space Administration,
under their several statutory authorities.  See 48 C.F.R.
§ 1.103.  Thus, the FAR has the force and effect of law.  Cf.
G.L. Christian and Assocs. v. United States, 312 F.2d 418, 424
(Cl.Ct.1963)(because the Armed Services Procurement Regulations
were issued under statutory authority, those regulations had the
force and effect of law).

23

15.   The materials, products, services and labor to be
      furnished in accordance with this Contract will be
      provided in strict accordance with the terms,
      conditions and requirements of all Prime Contract
      requirements, including General and Special Provisions
      and Conditions, Plans and Specifications and Addenda,
      which documents are incorporated herein by reference
      and are made a part of this Contract....

                       *    *    *

(Doc. 87, Exh. 2, Tab C, Article 15).

See, e.g., Stuart M. Perry, Inc. v. John Driggs Co., Inc., 1980

WL 143128, *1 (Va.Cir.Ct.1980), citing, VNB Mortgage Corp. v.

Lone Star Industries, Inc., 215 Va. 366, 370 (1974)(while the

subcontract in a general sense incorporates all of the prime

contract into its terms, in a legal sense the incorporation would

be only to the extent germane to that portion of the project work

to be performed by the subcontractor).  Thus, the Subcontract is

governed by the incorporated sections of the FAR applicable to

Plaintiff's work on the Oceana project.[18]

---

[18]Plaintiff maintains that, as a subcontractor on a
government project, the FAR does not apply to Plaintiff despite
its incorporation into the parties' Subcontract.  However, the
Court can find no support for this contention and the case on
which Plaintiff relies, United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed.Cir.1983), is inapposite.  Johnson Controls
did not hold that a subcontractor could not be subject to the
FAR.  Rather, Johnson Controls held that the Armed Services Board
of Contract Appeals did not have jurisdiction under the Contract
Disputes Act of 1978, 41 U.S.C. §§ 601-613, to decide a claim
brought directly by a subcontractor (rather than the prime
contractor) against the government.  Indeed, as Defendant notes,
"it would make no sense if Fleming were exempt from the basic
quality control requirements of the FAR, which clearly are
intended to protect the government when obtaining work from
contractors."  (Doc. 88, p. 8).

24

Defendant contends that under two sections of the FAR which were incorporated into the Subcontract, the Navy's approval of the sample splitter baffle in May and June of 2001 did not relieve Plaintiff of its obligation to comply strictly with the contract specifications in the fabrication of subsequent splitter baffles.  Those sections of the FAR provide in pertinent part:

> SPECIFICATIONS AND DRAWINGS FOR
> CONSTRUCTION (FEB 1997)
>
> \*   \*   \*
>
> (d) Shop drawings means drawings, submitted to the Government by the Contractor, subcontractor, or any lower tier subcontractor pursuant to a construction contract, showing in detail (1) the proposed fabrication and assembly of structural elements and (2) the installation (i.e., form, fit, and attachment details) of materials or equipment.  It includes drawings, diagrams, layouts, schematics, descriptive literature, illustrations, schedules, performance and test data, and similar materials furnished by the contractor to explain in detail specific portions of the work required by the contract....
>
> (e) ... **Approval by the Contracting Officer shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract**, ....
> (Emphasis added).
>
> \*   \*   \*

48 C.F.R. § 52.236-21.[19]

---

[19]With respect to the applicability of Section 52.236-21(d) to the sample splitter baffle fabricated by Plaintiff in this case, Defendant notes that the term "shop drawings" has been construed broadly to include mockups or samples.  <u>See</u>, <u>e.g.</u>, <u>Ellis-Don Construction, Inc.</u>, 99-1 BCA P 30,346 at p. 9, ASBCA No. 51,210 (1999)(government agency was not estopped from rejecting defective work at any time before final completion and acceptance because of a prior erroneous approval of a sample

25

INSPECTION OF CONSTRUCTION (AUG 1996)

\*   \*   \*

(c) **Government inspections** and tests **are for the sole benefit of the Government** and do not-

(1) Relieve the Contractor of responsibility for providing adequate quality control measures;

(2) Relieve the Contractor of responsibility for damage to or loss of the material before acceptance;

(3) Constitute or imply acceptance; or

(4) Affect the continuing rights of the Government after acceptance of the completed work under paragraph (i) below.

(d) **The presence or absence of a Government inspector does not relieve the Contractor from any contract requirement,** nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization.  (Emphasis added).

\*   \*   \*

_____

panel of masonry work by one of its representatives).  Plaintiff contends that Defendant's reliance on decisions of the Armed Services Board of Contract Appeals ("ASBCA") ignores the choice of law provision in the Subcontract which requires the application of Virginia law.  However, as noted by Defendant, Virginia courts have considered cases arising under federal construction contracts when there is no Virginia case law on point.  See Asphalt Roads & Materials Co., Inc. v. Comm. of Virginia, Dept. of Transportation, 257 Va. 452, 457, 512 S.E.2d 804, 807 (1999).  Moreover, the ASBCA's contract interpretations have been given great weight by courts due to their experience in interpreting government contracts.  See, e.g., United Pacific Ins. Co. v. Roche, 401 F.3d 1362, 1365 (Fed.Cir.2005)(the ASBCA's interpretation is given careful consideration and great respect because the board has considerable experience and expertise in interpreting government contracts).  See also D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 138-39, 452 S.E.2d 659, 663 (1995)(interpreting, under Virginia law, a contract clause similar to the FAR sections at issue in this case and holding that the county's approval of shop drawings did not relieve contractor of errors that existed in the shop drawings).

26

48 C.F.R. § 52.246-12.

After consideration, the Court agrees with Defendant that
Sections 52.236-21(e) and 52.246.12(c) and (d) of the FAR
unequivocally provide that government inspection or approval of a
sample does not relieve a contractor of its duty to comply
strictly with contract specifications, and that because the
parties' Subcontract is governed by these sections of the FAR,
the Navy's approval of the sample splitter baffle following
inspections in May and June of 2001 did not relieve Plaintiff of
its obligation to comply strictly with the contract
specifications in fabricating subsequent splitter baffles.  See
Appeal of Shirley Contracting Corp., 87-1 BCA P 19,389 at p. 12,
ASBCA No. 29028 (1986)(the applicable legal principle here is
that the failure of the Government to note improper performance
by a contractor does not legally excuse the contractor from its
obligation to meet contract requirements).

Under the circumstances, Plaintiff's claim that the sample
splitter baffle set the standard for acceptability of all
subsequent splitter baffles based on the Navy's approval of the
sample splitter baffle in May and June of 2001 fails as a matter
of law.

ii

In support of its claim that Defendant wrongfully terminated
the Subcontract for default, Plaintiff relies on the language in

27

Sections 1.4.2.1 and 3.3.2.1.a of Specification 13300 of the
Subcontract which states that the approved sample splitter baffle
"shall serve as the reference for establishing the acceptability"
of all fabricated splitter baffles.  Plaintiff maintains that
because the subsequent splitter baffles were as good as, or
better than, the approved sample splitter baffle, they were
acceptable under the contract specifications, and, therefore,
Defendant's termination of the Subcontract for default was
wrongful.

     In response to this claim, Defendant contends that
Plaintiff's proffered interpretation of Sections 1.4.2.1 and
3.3.2.1.a of Specification 13300 regarding the effect of the
Navy's approval of the sample splitter baffle ultimately is
irrelevant because the FAR supercedes any conflicting provision
in the parties' Subcontract.  The Court agrees.

     As noted by Defendant,[20] "[i]t is an established canon that
standard clauses for Government contracts, which are required by
law and by regulations having the effect of law, cannot be
contradicted by other specially drafted provisions so that they
are, in effect, written out of the contract or subordinated to
such special provisions."  See Appeal of Hydracon Corp., 75-2 BCA
P 11,489 at p. 7, ENGBCA No. 3462 (1975).  Plaintiff's
interpretation of the language in Sections 1.4.2.1 and 3.3.2.1.a

---

[20](Doc. 88, p. 11)

28

of Specification 13300 of the Subcontract regarding "reference

for establishing the acceptability" of all fabricated splitter

baffles conflicts with Sections 52.236-21(e) and 52.246-12(c) and

(d) of the FAR which requires strict compliance with contract

requirements.   Because the FAR has the force and effect of law,

the Court agrees with Defendant that the FAR supercedes any

provisions in the Subcontract that conflict with it.[21]   As a

result, even if Plaintiff's interpretation of Sections 1.4.2.1

and 3.3.2.1.a of Specification 13300 is correct, Plaintiff's

argument fails as a matter of law.

iii

Finally, regarding Defendant's third argument in support of

its renewed motion for partial summary judgment, the Court agrees

with Defendant that Plaintiff's proffered interpretation of

Sections 1.4.2.1 and 3.3.2.1.a of Specification 13300 is

unreasonable and illogical and that no conflict actually exists

between these sections of Specification 13300 and Sections

52.236-21(e) and 52.246-12(c) and (d) of the FAR.   As noted by

Defendant, contrary to Plaintiff's contention, neither Section

1.4.2.1 nor Section 3.3.2.1.a of Specification 13300 state that

the Navy is "bound by an approved sample" or that the approved

---

[21]As Defendant also notes, "[s]ince Congress has chosen to
regulate contracts for the acquisition of supplies and services
by the Navy, it defies common sense that private parties would be
able to waive or modify the regulations freely."   (Doc. 88, p.
11).

29

sample sets the "standard" for acceptability of subsequent
splitter baffles.  (Doc. 88, p. 12).  Rather, these sections of
Specification 13300 simply state that the sample splitter baffle
"shall serve as the reference for establishing the acceptability"
of all splitter baffles.  The Court agrees with Defendant that
this language simply "contemplates that the sample will serve as
a visual check" for the fabrication of subsequent splitter
baffles, which interpretation is supported by Plaintiff's own
shop foreman, John List, who testified during his deposition that
he consulted the approved sample splitter baffle only
"occasionally" and merely as a "visual check" in the fabrication
of subsequent splitter baffles.[22]  (Doc. 87, ¶ 12, Doc. 88, p.

_____

[22]Plaintiff repeatedly asserts that Defendant takes the
position that Sections 1.4.2.1 and 3.3.2.1.a of Specification
13300 are meaningless in light of Sections 52.236-21(e) and
52.246-12(c) and (d) of the FAR (Doc. 91, pp. 3, 4, 7-8, 12), and
Plaintiff contends that this position contravenes well-
established Virginia law under which a contract provision will
not be treated as meaningless if a reasonable meaning can be
ascribed to it.  See, e.g., Dominion Sav. Bank, FSB v. Costello,
257 Va. 413, 417, 512 S.E.2d 564, 567 (1999)(No word or clause in
a contract will be treated as meaningless if a reasonable meaning
can be given to it, and there is a presumption that the parties
have not used words needlessly).  In this connection, the Court
notes that it has never construed Defendant's position to be that
Sections 1.4.2.1 and 3.3.2.1.a of Specification 1330 are
meaningless in light of Sections 52.236-21(e) and 52.246-12(c)
and (d).  To the contrary, Defendant's position gives effect to
all applicable provisions of the Subcontract, the Prime Contract
and the FAR sections incorporated therein in accord with Virginia
law: that is, that the language of Sections 1.4.2.1 and 3.3.2.1.a
of Specification 13300 on which Plaintiff relies in support of
its breach of contract claim against Defendant simply
contemplates that the sample splitter baffle will serve as a
visual check in the fabrication of subsequent splitter baffles.

14). Significantly, as Defendant further notes, Section 1.4.2.1
of Specification 13300 goes on to state that the sample splitter
baffle "shall conform to all of the requirements of the contract
including quality control, testing, form, fit, size and function
and shall meet all the requirements of the contract
documents...."

Based on the foregoing, Defendant's renewed motion for
partial summary judgment will be granted.

Motion for Summary Judgment as to Liability

Defendant also has filed a motion for summary judgment as to
liability on the parties' respective breach of contract claims.
(Doc. 84). After consideration, the motion will be granted.

As noted by Defendant, Plaintiff's complaint in this case is
predicated on the claim that Defendant's termination of the
parties' Subcontract was wrongful, and that, therefore, the
termination should be construed as a termination for Defendant's
convenience, entitling Plaintiff to damages under Article 29 of
the Subcontract. Conversely, Defendant's counterclaim against
Plaintiff is predicated on the claim that its termination of the
parties' Subcontract was for cause, entitling Defendant to
recover damages from Plaintiff for breach of contract.

---

It does not set the standard for acceptability of all
subsequently fabricated splitter baffles, relieving Plaintiff of
its obligation to comply strictly with the contract
specifications.

As noted previously, in a Memorandum Opinion filed on August 19, 2005, the Court denied Plaintiff's motion for summary judgment as to Defendant's liability based on a determination that the undisputed facts established that Defendant's termination of the parties' Subcontract was for cause (i.e., Plaintiff's failure to fabricate splitter baffles which complied with the contract specifications in a timely manner). Thus, Defendant cannot be liable to Plaintiff for wrongful termination of the Subcontract and Plaintiff is liable to Defendant for breach of the Subcontract. Under the circumstances, the only

32

remaining issue in this case is the amount of damages to which
Defendant is entitled on its counterclaim.[23]

An order follows.

Arthur J. Schwab
United States District Judge
for
William L. Standish
United States District Judge

Date: July **10**, 2006

_____

[23]In response to Defendant's motion for summary judgment as
to liability, Plaintiff asserts that the motion should be denied
or stricken as untimely or unauthorized. (Doc. 92, pp. 4-5).
Because the Court agrees that, in light of its August 19, 2005
Memorandum Opinion, the only remaining issue in this case is the
amount of damages recoverable by Defendant on its counterclaim,
the Court declines to deny or strike Defendant's motion for
summary judgment as to liability as untimely or unauthorized.

33